**520 EAST 72ND COMMERCIAL CORP., 520 East 72nd Garage Corp., and 520 East 72nd Street Laundry Corp., Plaintiffs,**

v.

**520 EAST 72ND OWNERS CORP., Defendant.**

**No. 86 Civ. 7581 (MP).**

United States District Court, S.D. New York.

July 20, 1988.

Stults & Marshall by John T. Van Der Tuin, Eric D. Balber, New York City, for defendant.

Abrams, Lerner, Kisseloff, Kissin & Lapidus, P.C. by Steven R. Lapidus, Stanford M. Singer, New York City, pro se.

## OPINION

MILTON POLLACK, Senior District Judge.

A contingency fee retainer agreement is challenged by a cooperative corporation as unconscionable, unreasonable and out of all proportion to the value of the legal services rendered, prospectively and retrospectively. For the reasons indicated hereafter, the contingent retainer agreement will be declared null, void and unenforceable and the attorney remitted to a reasonable compensation in quantum meruit.

## I. *Background*

520 East 72nd Street Owners Corp. ("520") is a cooperative apartment corporation. In 1984 it was converted from its status as a privately owned apartment building to cooperative ownership under the provisions of N.Y. General Business Law § 352. As part of the offering plan, the sponsor of the conversion ("the Sponsor") obtained for itself three long-term leases from the new cooperative, 520, at rents well below the market rental obtainable therefor. The leases were of (1) the parking garage in the building; (2) a concession for the laundry facility; and (3) a commercial lease with privileges to the lessee to sublet five apartment units for professional offices. The latter was the most valuable of the leases.

The cash flow to 520 from these leases was inadequate and the leases were burdensome to 520. The general counsel to 520, who possessed considerable experience in the field, advised 520 that relief from the burdensome leases might be available under the Condominium and Cooperative Abuse Relief Act, 15 U.S.C. § 3601 et seq. ("the Act"). That Act was designed to remedy abuses by sponsors of cooperative and condominium conversions who, through self-dealing in the course of conversion to cooperative ownership, retained longterm leases for themselves with the new owner-corporation at rentals well below their market values. Such "Sweetheart Leases," so-called, were subject to termination under the statute where it could be shown that they had been entered into at a time when the cooperative association was still under the voting control of the developer of the conversion plan and the leases were for a term of more than

three years. Action to terminate such leases was required by the statute to be undertaken within two years after (i) the sponsor lost control or (ii) the date on which the developer owned 25% or less of the units in the conversion project.[1]

A vote of two-thirds of the cooperative owners was required to terminate "Sweetheart Leases" as a predicate for a declaratory judgment of validity of the termination.

The law firm of Abrams, Lerner, Kisseloff, Kissin & Lapidus, P.C. ("Abrams, Lerner") had been retained in 1985 by 520 as its general counsel shortly after the conversion to a cooperative, on an annual retainer fee basis of $5400.00 payable in monthly instalments. Abrams, Lerner also earned fees from 520 from the sales of shares of stock and conveyances of proprietary leases. Mr. Lapidus of the law firm handled the 520 account.

There was little precedent in reported case law, but what there was in 1986 indicated that the New York State Courts were more favorably inclined toward terminating such leases than the Federal Court. In a District Court decision which seemed to involve nearly identical circumstances and legal questions applicable to 520, Judge Whitman Knapp had granted a motion for summary judgment by three corporations affiliated with the sponsor of a conversion, on the ground, *inter alia*, that the cooperative had negotiated the leases with the sponsor as part of an arm's length dealing during the conversion process. *West 14th Street Commercial Corp. v. 5 West 14th Owners Corp.*, 625 F.Supp. 934 (S.D.N.Y. 1986).

---

1. The operative provision of the Act, Section 3607, provides:
 (a) Any contract or portion thereof which is entered into after October 8, 1980, and which—
 (1) provides for operation, maintenance, or management of a condominium or cooperative association in a conversion project, or of property serving the condominium or cooperative unit owners in such project;
 (2) is between such owners or such association and the developer or an affiliate of the developer;

 (3) was entered into while such association was controlled by the developer through special developer control or because the developer held a majority of the votes in such association; and
 (4) is for a period of more than three years
 . . .
 may be terminated without penalty by such unit owners or such association.
 15 U.S.C. § 3607.

Nonetheless, Mr. Lapidus was of the opinion and so advised 520 that termination of the alleged Sweetheart Leases would almost certainly be validated if litigation thereon were instituted in State Court, because there had been no negotiation between the Sponsor and 520 at the time of the conversion. Mr. Lapidus urged 520 to take a vote of the 520 corporation apartment owners and proceed with a suit to terminate the three leases.

To prepare the directors on the subject, Mr. Lapidus had furnished the president of 520 and distributed to the other directors a legal memorandum prepared in his office for his guidance outlining the statute, the procedure thereunder and the case law. As one director testified, the memorandum was a piece of "legalese" and was, according to the directors, scarcely understood by them.[2] For ordinary laymen consumption, Mr. Lapidus testified that he had sent to the president of 520 a packet of materials, including a publication entitled "New York Co-op and Condo Insider" and an article from the New York Law Journal explaining the District Court decision in *West 14th Street*, which was being appealed.

The termination matter was aired at a stockholders annual meeting held by 520 on May 29, 1986. It was pointed out that a vote to terminate had to be taken before October 17, 1986; but the May 29, 1986 meeting ended without any vote being taken on the question of termination of the leases.

Mr. Zastrow, the Sponsor's attorney, testified that as the crowd was dispersing after that meeting, he approached Mr. Lapidus and conveyed an offer authorized by his client to agree to a standstill of the controversy between the cooperative and the Sponsor until the Second Circuit made its determination in *West 14th Street*. Mr. Zastrow wished to save his client the expense of litigating the termination before the Second Circuit had ruled. He testified that Mr. Lapidus gave him no real response —"he didn't say yes or no"—but said in substance that he would "think about it." Mr. Zastrow made no note or memorandum of the alleged offer. Mr. Lapidus denied ever conversing with Mr. Zastrow or hearing his suggestion.

The 520 owners were troubled by the specter of large legal expenses to be incurred in a termination suit. They had been forewarned by the Sponsor and its attorneys that immense fees had been built up and incurred in the *West 14th Street* case. The same sponsor or an entity thereof was the sponsor in *West 14th Street* and in 520. They spoke of having incurred legal fees and costs of approximately $100,000 in *West 14th Street*.

Mr. Lapidus dismissed the attempt by the Sponsor "to scare the shareholders into believing that they would be subject to huge legal bills if they took the termination." When asked by the Court at the hearing held herein whether he believed his client would be subject to fees of that proportion, Mr. Lapidus replied, "I did not."

The Court later questioned Mr. Lapidus again regarding the picture painted by the Sponsor of hundreds of thousands of dollars in legal fees:

COURT: You didn't believe that and you told your client that you didn't believe it, didn't you?

LAPIDUS: That's correct, your Honor.

At a meeting of the 520 Board members not affiliated with the Sponsor (the Executive Committee) just shortly before the May 29, 1986 annual stockholders meeting, Mr. Lapidus, on questioning, represented to the Committee that taken at his ordinary hourly charges ($225 per hour), he estimated that a litigation of a termination case through to summary judgment would probably involve fees totaling $10,000. This stated estimate was confirmed by notes taken by one of the Board members, Ms. Farley, the treasurer, by Mr. Hamm's testimony and on cross-examination of Mr. Lapidus at the fee hearing. The notes Ms.

---

2. Describing the internal legal memorandum, one Board member, Ms. Rashbaum, "found it ... to be basically incomprehensible." She asked Mr. Lapidus for something "that would explain the same information in layman's terms," but received nothing.

Farley produced, taken at the May 19, 1986 Executive Committee meeting, stated:

$10,000 initial filing

If it gets to trial—

would get a settlement offer.

Mr. Hamm also testified that he was told by Mr. Lapidus that the legal fees were "not going to be an outrageous amount."

Mr. Lapidus testified:

I told Hamm that I believed that my hourly fees, absent a trial, absent a trial on the facts, would not exceed $10,000. ... [This included] preparing the papers to commence the action in State Court, and defending the action ... if there was one in Federal Court. It was my belief at that time that ... the matter would be litigated in State Court, and that it would probably cover the making of a motion for summary judgment. ... To start the summons and complaint in State Court and to get a motion made ... [for] summary judgment ... I believe that the fees on an hourly basis would not exceed $10,000.

He repeated this testimony several times:

[M]y estimate was to get started on the case the hours might come up to $10,000. ... I thought that that might carry us through a motion for summary judgment.

Mr. Lapidus discussed the $10,000 estimate initially with Mr. Hamm; and he did not dispute also discussing it with Ms. Farley.

In response to an inquiry by the Court as to how Mr. Lapidus was able to convince the shareholders that this was a $10,000 case and not a hundreds of thousands of dollars case as pictured by the Sponsor and its attorneys, Mr. Lapidus prepared a memorandum which Mr. Hamm used in sending out letters to the shareholders, prepared the letters themselves and prepared the arguments that the other directors of the Executive Committee used to discuss termination with the tenants.

This $10,000 estimate reasonably had the obvious effect of conditioning the minds of the 520 Board to a fee expectancy of similar proportions, albeit, it was as a measure of the value of non-contingent services through to summary judgment.

Even that estimate apparently did not produce the necessary support for a successful termination vote; the estimated expense was not appealing to the stockholders. After the May 29 shareholder meeting, the Board soon realized that the only way to obtain the necessary votes for termination of the leases was to assure the shareholders that no expense would be incurred unless the terminations of the three leases were successful. The prospect of enormous legal fees to be paid, no matter how pooh-poohed, would, in the Board's opinion, serve to defeat an affirmative vote.

The Board members believed that the only way to garner the two-thirds vote necessary for termination would be to agree with their general counsel on a contingent fee arrangement for handling a termination case. One of the Board members, Errol Schneer, thus proposed arranging for legal representation on a contingency basis. After an initial reluctance, Mr. Lapidus finally agreed to take the case on such a basis.

With an agreement in principle for a contingency retainer virtually in place, the effort to persuade shareholders to vote for termination was successful at the special meeting of shareholders on September 26, 1988.

After the shareholder vote was counted, a Board meeting was held on October 1, 1986 in Mr. Lapidus' office, followed by an Executive Committee meeting. Mr. Hamm, the president, arrived after the others, signed the notices of termination of the leases and submitted a letter of resignation as president, effective the following day. The remaining Executive Committee members proceeded to discuss a contingency retainer agreement with Mr. Lapidus. The Board was under the misimpression from Mr. Lapidus that he had negotiated the terms with Hamm before that meeting; Hamm testified, however, that he was not a party to any such negotiations with Mr. Lapidus.

The agreement, presented to the Executive Committee meeting for the first time on October 1, 1986, was essentially in final form and ready to be executed. This came as an unpleasant surprise to most and objections were promptly raised to many of the terms. Mr. Chacko, the new acting president, testified, asking: "How could we be in a position to sign something that we were seeing for the first time"?

The agreement, as finally executed on October 1, 1986, provided in pertinent part that Mr. Lapidus would represent the Cooperative Corporation in any litigation arising from the termination of the three leases, on the following terms and conditions:

(1) You [client] will pay us [Abrams, Lerner] legal fees in this regard only, if, as and when any or all of the above Leases and Agreements are successfully terminated, or your claim for termination is settled.

(2) If there is a successful termination, you shall pay us an amount equal to *Fifty (50%) Percent* of any increase in income to your Corporation resulting from the said termination and the execution of any subsequent Leases or Agreements for the first Two (2) Years following such successful termination, but *in no event less than* the sum of *$375,000.00,* or

(3) *If you settle* your claim for termination, you shall pay us an amount equal to *Forty (40%) Percent* of the consideration received on account of such settlement but *not more than $750,000.* shall be payable to us.

*In addition* to the foregoing, we shall receive an amount equal to *50% of all sums paid* for or on account of your legal fees and expenses either by judgment of any Court or by settlement.

. . . . .

It is expressly agreed that nothing herein shall obligate this firm to represent you in any Appeal from an adverse determination or ruling. (Emphasis supplied).

Because Mr. Hamm had just resigned as president and left the meeting, the remaining directors "were doubly uncomfortable in that [they] didn't know what—to what extent the provisions here were agreed to, or stipulated by him, and which ones were put in by Mr. Lapidus." Objections were voiced and questions were raised as to the minimum fee of $375,000; to the "secondary" fees going to Abrams, Lerner should the Cooperative be awarded attorneys' fees by the court or by settlement; to the provision releasing Mr. Lapidus from any obligation to represent his client if an appeal were taken; and to the "any or all" language in paragraph 1.

Ms. Farley, the treasurer, personally raised "four points" with which she disagreed and which she did not understand. She "didn't understand or agree with the any and all discussion"; the "floor, as an accountant . . . didn't seem the right thing" to her; she "objected to Mr. Lapidus [additionally] getting secondary legal fees [50% of a Court award] . . . and further objected to a section . . . that he was not obligated to go beyond the first court . . . [and] if [they] lost in the first court, that [they] would have to then renegotiate or repay him on appeal." When asked by the Court what she meant by a "floor," Ms. Farley replied, "The $375,000."

Mr. Chacko, the acting president, testified that at that meeting, in discussing the terms of the retainer agreement:

The first item that jumps out of the page is the $375,000 and that was uniformly the first item that everybody turned to and asked how can the fee be that much.

Another member of the 520 Executive Committee present, Ms. Rashbaum, also testified:

There were a number of issues which were of concern to the Board members. The dollar amount was obviously the first concern; that $375,000 figure.

The $750,000 figure in the third paragraph of the retainer agreement was a hopelessly illusory figure since by no stretch of the imagination could there arise a situation warranting such a fee "for the first Two (2) Years following such successful termination"; but it did tend superficially to distort what was actually involved

and made the $375,000 "minimum" figure seem to be in line.

Mr. Lapidus brushed aside the "any or all" provision of paragraph 1 as "legal jargon" that meant nothing. Mr. Lapidus told the Board members that the provision for an additional amount to be received by him for attorneys' fees awarded was standard, legally required, and in the best interest of the Cooperative. The only issues ever discussed in laymen's terms were the unfair burden of the leases on the Cooperative and the absence of negotiation at arms' length of the leases.

Against this array of evidence from the directors, Mr. Lapidus countered with the following testimony:

> Nobody disputed the agreement. Nobody took exception to the agreement. Nobody asked for time to talk with anybody else about the agreement, ... not one member of the people at that meeting ever questioned the retainer.

The Board members present testified that they felt pressured to sign the agreement that evening. Mr. Lapidus had impressed upon everyone present the importance of commencing suit in the State Court at once; and that he could not prepare papers until the retainer matter was out of the way. The limitary period for notice of termination was expiring within a few weeks and the Sponsor was impatiently and persistently seeking the outcome of the shareholder vote so that it could head off the expected suit by 520 by being the first to commence suit in Federal Court to declare the leases valid. The prospect of losing the jurisdictional race to the Federal Court by any dallying over the retainer agreement as described by Mr. Lapidus meant that the Board was confronted with a deadline which the Board, especially its new acting president, Eapen Chacko, did not wish to miss.

Mr. Chacko testified on direct examination at the hearing:

> So my own personal preference would be to take a document like this, have a discussion, leave the room, and give everybody the opportunity to have it reviewed by their lawyers, their friends, their accountants, people in the business, whatever, and that's something that—an opportunity we didn't have. So we were extremely uncomfortable.
>
> Q. Did you request that opportunity?
> A. Yes, I did, very specifically.
> Q. Was there a response?
> A. The response was that there was no time, and also basically he was our counsel and our adviser and any questions we had on this could be basically answered by himself.

Mr. Chacko was questioned further by the Court:

> COURT: Did you express any reaction to being requested to sign this agreement?
> A: Yes, your Honor, I did.
> COURT: What did you say?
> A: I said I'd like to take this agreement out and show it to another lawyer.
>
> . . . . .
>
> I said I would like not to sign this agreement.
>
> . . . . .
>
> I said I don't understand all the provisions here, and that this seems like a lot of money.

Ms. Farley testified in this regard:

> I felt that we were backed into a corner, that whatever—that we had no choice but to sign that agreement on that particular day. ... Mr. Lapidus refused to put any papers in court until we signed the contingency agreement. ... Even though I strenuously objected to all those points, I felt that we had no alternative.

She testified on cross-examination by Mr. Lapidus:

> I suggested filing. It took you [Lapidus] a week to prepare the papers. You didn't have the papers ready until October 1, or actually you didn't have them ready until October 3, and I kept saying, can't we stall and sign the [retainer] agreement after you have filed the papers, and you would not let us do so.

Ms. Rashbaum also testified:

The thing I remember most about the meeting was Mr. Lapidus explaining to us that there was a—what he called a standard contingency fee arrangement, and that he was acting in the best interests of the co-op, and we were under a time constraint that forced us to sign the agreement that evening. ... That we had no time left if we didn't sign the agreement that night and allow him to get right to work. ... It was certainly clear to me that we had to sign it that evening.

. . . . .

My concern was mostly a general concern about we were being required to sign an agreement that same evening without having a chance to discuss it amongst ourselves or with anybody else, and to thoroughly investigate every item. ... Not being a lawyer, not understanding all of the implications of what we were signing, gave me concern for the agreement as a whole.

Although Mr. Lapidus elicited on cross-examination that he did not physically coerce Mr. Chacko into signing the retainer agreement or prevent him from leaving the room to consult another lawyer, there is little doubt that obtaining the signature under the circumstances was unbefitting a fiduciary. He presented the situation as one with a severe time constraint and of extreme urgency and said, according to Mr. Chacko, that "there was a deadline pressure."

Mr. Lapidus dismissed Mr. Chacko's request to take the agreement to an independent lawyer for review. Mr. Lapidus called it a standard contingency agreement and assured the directors that he was acting in the best interest of the cooperative. One Board member had suggested commencing suit and deferring execution of the retainer agreement while the terms were discussed more thoroughly and reviewed by other counsel. The simple service of an ordinary summons with or without notice, as permitted in State Court, would have removed the pressure of preparation of a complaint. See N.Y.CPLR 304. Mr. Lapidus rejected that suggestion. Mr. Lapidus made the

Board members feel, they said, as if "a gun was being put to [their] head," that they had no alternative but to sign the agreement as soon as possible.

As Mr. Schneer, then the secretary of 520, testified:

I have a recollection of the critical need to move forward very, very quickly or else we would lose the case.

Q. Is it your recollection, Mr. Schneer, that the action taken by the Board in this connection was in fact unanimous?

A. We had no other case [sic] [choice]. The answer is yes.

After the agreement was signed, the litigation actually continued in essence for only eighteen days. On or about October 3, 1986, Mr. Lapidus served a summons and complaint to institute a State Court action for a declaratory judgment. On the same day as service of the State Court papers, the Sponsor filed its complaint in this Court.

On October 21, 1986, a pretrial conference in this federal action was held in the Court's Chambers. After the matter was explained and at the suggestion of the Court, the two cases were *put on hold immediately*, the hold to remain pending until the determination of the Court of Appeals, Second Circuit in *West 14th Street*. Only one essential matter remained open—to obtain security for rents due to 520 on the leases—and at the Court's suggestion and agreement of the parties a satisfactory bond was agreed upon and posted. In the interim, until the cases were ultimately dismissed, voluntarily, no answers were served, no motions were made, no hearings were held, no discovery took place, no court appearances were required, and no call for services was necessary other than to sign four stipulations extending the times to answer the complaint in the Federal Court suit and to follow the course of *West 14th Street* in the Court of Appeals and then on petition for certiorari, which was denied. —— U.S. ——, 108 S.Ct. 151, 200, 98 L.Ed.2d 107 (1987).

*West 14th Street* was decided by the Court of Appeals, Second Circuit in March

1987. 815 F.2d 188 (2d Cir.1987). The Court of Appeals reversed the District Court's ruling on the Garage and Laundry Leases and held they could be terminated pursuant to the Act because they "serv[ed] the ... cooperative unit owners," as required under subsection (a)(1). The Court held, however, that the highly valuable Commercial Lease could not be terminated, because that subsection did not apply to it. The Commercial Lease, which permitted the lessee to sublet units to the public for professional offices or commercial stores, was "primarily for the benefit of the *public*" and commercial stores "do not serve as an integral benefit to the unit holders in the same respect as on-site parking." 815 F.2d at 199 (emphasis in original). The Court emphasized the purpose of the Act stated in the legislative history: to protect property providing services primarily for the benefit of the unitowners. *Id.*

Once the Cooperative Board learned about the Second Circuit decision, it felt that it had suffered a grave defeat; the "crown jewel of the leases" was the professional apartment lease (and its five subleases), and termination of such a lease in *West 14th Street* was not validated. The value of the Commercial Leases in 520, according to an appraisal performed for the Board, was $267,000 per year above what the Cooperative was receiving from the Sponsor; the value of the Garage Lease was $105,000 greater per year; and the value of the Laundry Concession was $2,000 greater per year than what was currently being received. Thus even if only the Laundry Concession, expected to bring in merely an additional $2,000. per year, were successfully terminated, the law firm would be entitled to a fee of $375,000

under the contingent retainer agreement Mr. Lapidus obtained from the Board.[3]

The Board had considered the three leases only as a unit and was not told and did not realize that one or two could stand legally while the valuable one, the third, could not be retrieved. Mr. Chacko testified:

Q. Had there ever been a suggestion that the leases might not be treated as a group and maybe you might be able to terminate some but not all of the leases?

A. No, that was never contemplated, suggested, or heard for a moment.

Ms. Rashbaum also testified:

In all of the time that Mr. Lapidus spoke with us, he spoke with us of the leases as a single unit. Never explained to us that they were three individual sets of leases which—one of which or two of which or all three of which might be terminated or not.

Ms. Farley testified:

I personally also felt that in this particular case that there could be no split. ...
In this particular case there was clearly no negotiation with the Sponsor, so in this particular case [Mr. Lapidus'] interpretation was that it was all or none, that there was no possibility at all of splitting.

As a result of the decision of the Court of Appeals, there was a split in the terminations sought by 520; the professional leases were not terminated. The parties discontinued the State Court action in June 1987 by stipulation. They then stipulated and the Court, on June 23, 1987, entered an order granting summary judgment to the Cooperative with respect to the Garage Lease and Laundry Concession and in favor of the Sponsor with respect to the Commer-

---

**3.** *Cf. Vernitron Corp. v. CF 48 Associates,* 104 A.D.2d 409, 410, 478 N.Y.S.2d 933, 934 (2d Dep't 1984):

Where the contract containing the liquidated damages clause for its breach contains numerous convenants of varying degrees of importance, if the loss which might be anticipated as resulting from a breach of even the least of them is disproportionate to the amount of liquidated damages, or if the loss which might result from a breach of any one

of the covenants is readily ascertainable, then the clause will be held to be a penalty and unenforceable.

*See also Headquarters Rest Corp. v. Reliance Vending Co.,* 133 A.D.2d 444, 446, 519 N.Y.S.2d 662, 663 (2d Dep't 1987) ("Generally, where a contract provides for acceleration as a result of breach of any of its terms, however trivial or inconsequential, such a provision is likely to be considered an unconscionable penalty.").

cial (professional) Lease. This consensual arrangement was the only significant legal step taken by Mr. Lapidus in the matter since the standstill of October 21, 1986:

> COURT: So that after the case went on hold into 1987, the next significant thing that happened in the case was a stipulated summary judgment, is that right?
>
> LAPIDUS: I believe it is.

Thereafter, only a damage figure—the accrued rents on the terminated leases—needed to be determined, which required an accounting from the Sponsor and nothing from Mr. Lapidus or his firm. The accrued rentals proved to be $47,863. and a stipulation to that effect was entered in the Court records.

Counsel billed the Cooperative $375,000, payment of which the Cooperative resisted because it believed the retainer agreement was no longer relevant after the *West 14th Street* ruling, since all of the leases were not terminated (particularly the most valuable one). Mr. Chacko asked Mr. Lapidus to negotiate a fee with him, in light of the outcome of the case; Mr. Lapidus refused. On December 11, 1987, before the question of damages due the Cooperative was fully resolved, 520 discharged Abrams, Lerner as its lawyers and 520 applied to this Court to deal with the fee question as part of the legal proceedings.

## II. *Jurisdiction to Hear the Fee Dispute*

 Abrams, Lerner has challenged this Court's jurisdiction to hear the dispute over attorneys' fees. In general,

> [a] federal court may, in its discretion, exercise ancillary jurisdiction to hear fee disputes and lien claims between litigants and their attorneys when the dispute relates to the main action, regardless of the jurisdictional basis of the main action. 'This power resides in the federal court as ancillary to its conduct of the litigation.'

*Marrero v. Christiano,* 575 F.Supp. 837, 839 (S.D.N.Y.1983) (underlying litigation was still in progress) (quoting *National Equipment Rental, Ltd. v. Mercury Typesetting Co.,* 323 F.2d 784, 786 (2d Cir.

1963)); *see also Pomerantz v. Schandler,* 704 F.2d 681, 683 (2d Cir.1983) (main action was still pending while district court decided question of attorneys' lien). Moreover, this ancillary power "extends to disputes that arise after the initial litigation is no longer before the court." *Petition of Rosenman Colin Freund Lewis & Cohen,* 600 F.Supp. 527, 531 (S.D.N.Y.1984) (citing *Application of Kamerman,* 278 F.2d 411, 413 (2d Cir.1960)), *rev'd on other grounds,* Nos. 87–7957, 87–9049 (2d Cir. June 20, 1988).

The fee dispute before the Court relates to the main action, and this Court may exercise its ancillary jurisdiction to hear the dispute. *See Petition of Rosenman Colin,* 600 F.Supp. at 531 (finding ancillary jurisdiction because dispute related to the main action). Indeed, the nature of a contingent fee arrangement necessitates resolution of an attorney-client fee dispute *after* the underlying case has been resolved by judgment or settlement; it simply can not be resolved at the time the court acts to permit substitution of counsel. *Cf. Novinger v. E.I. DuPont de Nemours & Co.,* 809 F.2d 212, 217 (3d Cir.) ("the rule of necessity with respect to attorney-client disputes growing out of the substitution of attorneys in the course of litigation must be broad enough to permit the resolution of those disputes after the underlying case has been resolved by judgment or settlement"), *cert. denied,* —— U.S. ——, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987).

Abrams, Lerner's objection to this Court's jurisdiction over the dispute was accordingly rejected.

## III. *Unconscionability of the Retainer Agreement*

 Courts have "traditional authority ... to supervise the charging of fees for legal services under the courts' inherent and statutory power to regulate the practice of law." *First National Bank of East Islip v. Brower,* 42 N.Y.2d 471, 474, 368 N.E.2d 1240, 1242, 398 N.Y.S.2d 875, 876 (1977); *Williamson, P.A. v. John D. Quinn Constr. Co.,* 537 F.Supp. 613, 617 (S.D.N.Y.1982) (Weinfeld, J.) ("An agree-

ment will not be enforced where the compensation sought is 'excessive, or out of proportion to the value of the attorney's services.' ").

Contingent fees may be disallowed as between attorney and client in spite of contingent fee retainer agreements, where the amount becomes large enough to be out of all proportion to the value of the professional services rendered.... [T]he amount of the fee, standing alone and unexplained, may be sufficient to show that an unfair advantage was taken of the client or, in other words, that a legal fraud was perpetrated upon him. *Gair v. Peck,* 6 N.Y.2d 97, 106, 160 N.E.2d 43, 48, 188 N.Y.S.2d 491, 497 (1959), *cert. denied,* 361 U.S. 374, 80 S.Ct. 401, 4 L.Ed. 2d 380 (1960). The vice in a contingency arrangement may be determined not only by whether the contract was fair in the first instance but also by whether it became unfair in its enforcement. As stated by the New York Appellate Division: "[T]he recovery may be such that what was in the first instance a fair contract becomes unfair in its enforcement." *Matter of Friedman,* 136 A.D. 750, 751–52, 121 N.Y. S. 426, 428 (2d Dep't), *aff'd,* 199 N.Y. 537, 92 N.E. 1085 (1910), *cited with approval in Gair v. Peck,* 6 N.Y.2d at 107, 160 N.E.2d at 48, 188 N.Y.S.2d at 498.

■ After a full exploration of the facts and circumstances of this dispute, the Court finds that the contingent retainer agreement demands a fee that is grossly out of proportion to the value of the attorney's modest services. *See Gross v. Russo,* 47 A.D.2d 655, 655, 364 N.Y.S.2d 184, 186 (2d Dep't 1975) ("a full exploration of all the facts and circumstances, including the intent of the parties and whether the fee demanded is out of proportion to the value of the attorney's services, [was] necessary before a determination of unconscionability may be made").

The fee demanded here is in an amount which, with due regard to the contingent nature of compensation, is unreasonable and unconscionable factually and large enough to render the retainer agreement unenforceable under the circumstances of the case. *See Gair v. Peck,* 6 N.Y.2d at 107, 160 N.E.2d at 48, 188 N.Y.S.2d at 498. In the background of an estimate given by Mr. Lapidus of a $10,000 fee to carry the case to summary judgment on his hourly charge of $225 per hour, the provision *for the minimum payment of $375,000,* even if only the laundry concession could be terminated with an expected increase in rental income of $2,000 per year, provides a fee which "ceases to be a measure of due compensation for professional services rendered and makes the lawyer a partner or proprietor in the lawsuit." *See id.,* 6 N.Y. 2d at 112, 160 N.E.2d at 52, 188 N.Y.S.2d at 502; *cf.* Rules of the Sup.Ct., App.Div., First Dep't. § 603.7. Indeed, the fee smacks of a penalty; it is grossly disproportionate to the services rendered or contemplated and is unenforceable.

At the time Mr. Lapidus executed the contingency agreement, he stood in a fiduciary capacity vis-a-vis the Cooperative. He was paid on a flat retainer basis as general counsel. He had a duty to present fairly and fully the nature of what he might be called upon to do in the prospective lawsuit and the nature of his representation, the values at stake, and the likelihood of success with respect to the three leases involved, including the commercial lease. The fees provided for in the agreement were as unreasonable at the time the contract was signed as they later became in retrospect. The agreement is voided as an unconscionable and unreasonable arrangement between attorney and client.

■ A client has an absolute right to terminate the attorney-client relationship and discharge the attorney at any time, with or without cause. *See Demov, Morris, Levin & Shein v. Glantz,* 53 N.Y.2d 553, 555–56, 428 N.E.2d 387, 389, 444 N.Y. S.2d 55, 57 (1981). An attorney employed pursuant to a contingent fee retainer is entitled, however, to recover in quantum meruit for the fair and reasonable value of his or her services up to the point of discharge. *Jacobson v. Sassower,* 66 N.Y.2d 991, 993, 489 N.E.2d 1283, 1284, 499 N.Y.S. 2d 381, 382 (1985); *Lukashok & Liberman v. Smith,* N.Y.L.J., June 10, 1988, at 22,

col. 1 (Sup.Ct.N.Y.Co. June 9, 1988); *Rosenman & Colin v. Richard,* 850 F.2d 57, 63–64 (2d Cir.1988). In determining the value of an attorney's services in quantum meruit, the following factors must be considered:

1. The difficulty involved in the matters in which the services were rendered;
2. The nature of the services;
3. The amount involved;
4. The professional standing of counsel;
5. The results obtained.

*Lukashok* at 22, col. 1.

Mr. Lapidus did not render services pursuant to the contingent retainer agreement that could in any way be valued at $375,000 or be expected to be worth that amount. He was on a general retainer on October 1, 1986, when the contingent agreement was executed, and he remained on this fixed retainer and was paid for the month of December 1987, even after his discharge in the litigated matter. Many of the preliminary legal services provided which ultimately pertained to the terminations, such as the preparation of the internal legal memorandum sent to the Board and the data prepared to convince the stockholders to vote to terminate the leases, were services admittedly rendered and paid for under the general annual retainer.

When asked by the Court how he had arrived at a $375,000 minimum for a contingent fee in light of his estimate of $10,000 for non-contingent service, Mr. Lapidus responded:

> What [the retainer agreement] says, your Honor, is that the co-op asked us to take the risk of going through a trial, of going through discovery, of going through motion practice, in two courts, and to take the risk that no matter what happened, we would defend them in all of those proceedings, and all of the examinations before trial, and all of the trial preparation, and in all of the motion practice.
>
> . . . . . .
>
> It turned out that we didn't have to do all of those things, but we did take the risk.

Mr. Lapidus never did explain why $375,-000 as a minimum would be an appropriate fee for terminating the laundry concession which would yield a $2000 annual benefit to his clients.

Asked to detail what time he spent under the contingent retainer in the eighteen days from inception of the suit until the parties agreed to a total standstill of all proceedings, Mr. Lapidus replied: "We did not keep time records...."

■ There is a mandatory salutary requirement in this Circuit that "any attorney ... who applies for court-ordered compensation ... must document the application with contemporaneous time records" which "specify, for each attorney, the date, the hours expended, and the nature of the work done." *New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1148 (2d Cir.1983); *Soliman v. Ebasco Services Inc.,* 822 F.2d 320, 323 (2d Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 732, 98 L.Ed.2d 680 (1988). Under New York law also, in contractual fee cases, the burden is on counsel to keep and present records of time spent, and where adequate contemporaneous records have not been kept, the full amount of compensation requested should not be awarded. *See F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1265 (2d Cir.1987).

■ In the absence of records of time spent it becomes a speculation to assess the scope of the actual services rendered. Mr. Lapidus did prepare the summons and complaint; caused the service thereof; prepared a memorandum with respect to Rule 11 to criticize his adversary for having instituted the federal suit and gained priority therefor; prepared a memorandum of about two pages regarding summary judgment, for a motion never made; eventually obtained a bond through intervention by the Court for security of the rent accruals; and attended a conference before the Court. The case was then put on permanent hold for about 1½ years before a consensual stipulation was entered to dispose of the remaining merits of the controversy. Four stipulations were signed by

740

the firm extending the time to answer the complaint.

Taking into account all of the services performed and in full recognition of the realistic ones of the speculated contingencies involved, and in the interests of fairness and considering all of the data before it, the Court fixes the quantum meruit of the services rendered by Mr. Lapidus and his firm at $10,000. In light of the law firm's failure to maintain time records and the sparse services rendered from the date the retainer agreement was executed, this appears to the Court to be a generous valuation and takes into account the quantification of reasonable contingencies.

Accordingly, the firm of Abrams, Lerner is entitled for their services to receive from defendant $10,000 which shall be inclusive of costs and disbursements.

As to the issues of credibility, the testimony of the directors of the Cooperative Corporation was consistent, credible and unimpeached.

The foregoing together with the findings of July 6, 1988 made at the conclusion of the hearing shall constitute the findings of fact and conclusions of law required by Rule 52(a), Fed.R.Civ.P.

So Ordered.