Edward C. KING, Appellant,

v.

Lawrence A. FOX, Appellee.

Docket No. 04–0815–CV.

United States Court of Appeals,
Second Circuit.

Argued: May 25, 2005.

Decided: Aug. 2, 2005.

Fred R. Profeta, Jr., Esq., Profeta & Eisenstein, New York, NY, for Appellant.

Richard M. Maltz, Esq., Richard M. Maltz, PLLC, New York, NY, David S. Hammer, Esq., New York, NY, for Appellee.

Before: CALABRESI and B.D.PARKER, Circuit Judges, and MUKASEY, District Judge.*

MUKASEY, District Judge.

Edward King appeals from the District Court's grant of summary judgment to his former attorney Lawrence Fox in a dispute over Fox's fees. *See King v. Fox,* No. 97 Civ. 4134, 2004 WL 68397, 2004 U.S. Dist. LEXIS 462 (S.D.N.Y. Jan. 16, 2004). King argues that the District Court erroneously dismissed his collateral estoppel claim, that the fee agreement at issue was substantively unconscionable, and that the District Court's bases for granting summary judgment—ratification and laches—were improper. Because of ambiguities in New York law regarding client ratification of attorney fee agreements, we certify three questions relating to that issue to the New York Court of Appeals. We retain jurisdiction so that, upon receiv-

* The Honorable Michael B. Mukasey, of the United States District Court for the Southern District of New York, sitting by designation.

ing a response from the New York Court, we may rule on this appeal.

## I. Background

### A. Attorney–Client Relationship Between Fox and King

In 1972, appellant Edward King became a member of Lynyrd Skynyrd, a rock band that achieved great success in the 1970s and whose music is still well known today. While a member of Lynyrd Skynyrd, King played guitar and co-wrote several of the band's biggest hits, such as the southern anthem "Sweet Home Alabama." The band's 1973, 1974, and 1975 albums each went gold, and MCA signed Lynyrd Skynyrd to an exclusive recording agreement in 1974. (Joint Appendix (J.A.) 540) But eventually the band's hard partying and physically violent internal conflicts became too much for King to bear. One night in May 1975, when Lynyrd Skynyrd was on tour, King quit the band and left the tour, telling only the road manager about his decision. (J.A. 228–29)

Under Lynyrd Skynyrd's recording agreement with MCA, King was entitled to writer's and artist's royalties, because he had both written and performed songs for the band. While with the band, King received a weekly salary of around $300 (J.A. 232), in addition to writer's royalties, which he continued to receive after he left, through May 1976 (J.A. 231–34). However, King's artist's royalties, along with those of the other Lynyrd Skynyrd members, had been used to buy out the band's former manager Al Cooper for $1 million. (J.A. 231) King did not receive artist's royalties while he was with the band, nor did he receive them after he left.

In August 1975, in need of money, King consulted with New York entertainment lawyer Allen Grubman about the status of his artist's royalties. King believed that because the band had been so successful, the buyout of Cooper likely was complete, and it was time for him to start receiving his artist's royalties. Grubman secured for King an advance on his writer's royalties (J.A. 541), but informed King that he would need to retain a litigator in order to determine his entitlement to artist's royalties (J.A. 240). Grubman collected one-third of the advance he secured for King as his fee (J.A. 238–39), and referred King to his law school classmate Lawrence Fox for help with the artist's royalties issue. Grubman did not request any further payment from King. (J.A. 239)

Fox was a litigator by training, but when he first met with King, his practice consisted primarily of personal injury cases, and admittedly he "knew nothing about [the entertainment] field." (J.A. 62) King explained his predicament to Fox and noted that he was not sure exactly how much money he was due to receive from Lynyrd Skynyrd. He told Fox that he suspected he was entitled to his artist's royalties, and that there was a "log jam" somewhere (J.A. 461, 543). However, King had no paperwork or documentation specifying his rights under the MCA recording agreement to justify this hunch (J.A. 460). After their initial meeting, Fox investigated King's situation by calling Ina Meibach, Lynyrd Skynyrd's attorney, who informed Fox that King was not entitled to anything because he had quit the band, and that King actually owed the band money (J.A. 60). Meibach also refused to give Fox any information on King's contract with MCA (J.A. 61). Fox met with King for a second time and notified him that he believed "something was wrong," and that he would need to pursue the matter by getting the relevant documentation and perhaps initiating a lawsuit (J.A. 61, 73).

At that second meeting, Fox discussed his fee with King. At the time, King in-

formed Fox that he was in "dire financial straits and had no money for a retainer." (J.A. 74, 460) As a personal injury lawyer, Fox was accustomed to working on a contingency basis (J.A. 74), so he offered such an arrangement to King, and King "was thrilled about that" (J.A. 73). According to Fox, he explained to King that the retainer agreement would give Fox one-third of all of King's future royalties in addition to the recovery of any royalties past due. (J.A. 77) King claims that he understood the agreement to cover "the accumulated royalties of whenever he was to settle the dispute," but no further or future royalties. (J.A. 248, 251, 545)

Fox testified that the contingency agreement with King was a risky proposition for him, because King had not received any artist's royalties in years, because King was not sure exactly what his rights were under the MCA agreement, and because Meibach was claiming that King owed the band money (J.A. 74). However, according to King, Fox could not reasonably have thought their agreement was unduly risky, because King had informed Fox at their first meting that the band's debts had been paid, and because the band had earned more than $1 million annually in both 1974 and 1975, one seventh of which King was due to collect. (J.A. 544, 566-67)

Fox sent a formal contingency fee agreement to King in November 1975[1] which read:

> This is a retainer agreement authorizing us to proceed as your attorneys in the lawsuit against Lynyrd Skynyrd, Inc. and Ronnie Van Zant.
>
> Our fee for services in this matter will be a contingency fee, based upon any money recovered from the defendants. Our fee for representing you will be 1/3

of the recovery, whether by way of settlement, trial, judgment or other method. You will be responsible for any out of pocket expenses incurred for your benefit.

(J.A. 588) King signed this agreement.

By February 10, 1976, Fox had secured a copy of the exclusive recording agreement between MCA and Lynyrd Skynyrd and its members. (J.A. 120) The agreement contained a provision allowing King to order MCA to pay his royalties directly to him, bypassing the band and its agent (J.A. 65–66, 668), as well as a provision stating that breach by or termination of a band member was not grounds for suspension of royalty payments (J.A. 121). Fox decided to sue MCA on King's behalf even though the agreement on its face appeared to entitle King to royalty payments. King filed a complaint on September 30, 1976 (J.A. 123), MCA answered in January 1977 (J.A. 125), and in April 1977, MCA impleaded Lynyrd Skynyrd's manager Sir Productions, which was claiming that it was entitled to twenty percent of King's royalties (J.A. 128, 82). According to Fox, MCA "put in a very vigorous defense" (J.A. 80, 82) to King's lawsuit, claiming that King's departure from the band ended his entitlement to the benefits of the contract. There was a summary judgment motion in the case, but King's deposition was not taken. (J.A. 128, 546 n. 3) During the course of the litigation, in May 1976, King's writer's royalties, which had never been in question, stopped being paid. (J.A. 546) Eventually, in fall 1978, the parties came to a settlement agreement in which MCA agreed to pay King everything that he was owed, which totaled $213,000. (J.A. 85, 163–64) King later settled with

---

1. The date on the retainer agreement is November 26, 1976, but the parties have agreed that this date is a typographical error and should read November 26, 1975. (Fox Br. at 10 n. 2, King Br. at 17 n. 1)

Sir Productions, allowing it to collect 10 percent of the money due to him. (J.A. 85, 131)

In late fall 1978, when a tentative settlement agreement had been reached but before it had been signed, Fox and King had a telephone conversation in which Fox mentioned that under the retainer agreement, Fox would be receiving one-third of King's royalties in perpetuity. (J.A. 251–52) King was "shocked and surprised" by this information, but he "put it on the back burner" because getting the settlement funds was of the "utmost importance" to him. (J.A. 253) King asked Fox to send the settlement agreement and the retainer agreement to his wife's attorney, John Groon, to review. Groon did so, and wrote Fox with several questions, one of which was whether the retainer agreement entitled Fox to fees deducted from future royalty payments. (J.A. 528–29) Fox replied that the retainer agreement covered "all royalty money Ed is entitled to resulting from his involvement with Lynyrd Skynyrd ...," and urged King to call him if he disagreed. (J.A. 530)

In this correspondence, Fox also emphasized to Groon that time was of the essence, and that if King did not sign the settlement agreement with MCA by November 11, 1978, Fox would have to serve a complaint against Sir Productions, and MCA would deposit King's settlement money "into court as a stakeholder with the City of New York." (J.A. 526) If this happened, according to Fox, King would be liable for MCA's attorney's fees, the settlement money would not earn interest, and it would "take a long time plus a fee on Ed's behalf to receive the money back from the New York City Treasury." (J.A. 526) Groon shared this information with King, and King "panicked." (J.A. 259) His wife was about to have a baby, and he needed the settlement money. He did not want to risk liability for MCA's attorney's fees or his settlement money being tied up in the New York City Treasury for years. In fact, the settlement agreement provided that the money in dispute would remain in escrow and would not be deposited "into court" in the event that the settlement was not signed within sixty days; the record indicates that Fox misrepresented this fact to Groon. (J.A. 680–82) True or not, Fox's statements to Groon did the trick: King told Groon that Groon should have no further involvement with the matter (including the misunderstanding over Fox's fees), and he immediately signed and returned the settlement papers. (J.A. 260) Groon died soon afterward.

After the settlement was executed, sometime between Thanksgiving and Christmas of 1978, King informed Fox that he wanted to come visit him in New York to discuss the fee agreement. (J.A. 260) King testified to the events occurring when he arrived at Fox's offices. According to King, as he and Fox were walking down a long hallway, Fox

> pointed to a half dozen crates on the floor against the wall and he said: You know what those are? I said: No. He said: Those are all the papers related to your lawsuit. And I was blown away. I was overwhelmed. I mean, it was a lot of papers. I mean assuming the boxes were full, I mean, just a lot of work, you know. So we went inside, sat down, and talked a little bit more. And he made comments like he doubted if either he or his staff could be adequately compensated for all the hundreds of hours of work that was put in, pretty much he made me feel embarrassed to bring up the fee arrangement, which I did not do. I fully intended to talk to him about it, I never even brought it up.

(J.A. 261) Indeed, King and Fox did not discuss the fee arrangement again until

1986. In the meantime, Fox continued to collect one-third of all writer's and artist's royalties sent to King (even though the original dispute had concerned only artist's royalties). Payments would be sent to Fox, Fox would deduct his share and forward the balance to King.

In 1981, King asked Fox to represent him in another matter. In 1974, King had overdubbed guitar parts on 17 songs that had been recorded by the band in 1971, before King joined them. These recordings, called the Muscle Shoals Masters, were released in 1978, but King had never received any artist's royalties for his guitar work. In 1982, Fox filed a complaint against MCA demanding these royalties, and MCA filed an answer in 1984 (J.A. 558). MCA's motion to dismiss was denied, a decision the First Department affirmed by summary order in 1987. *King v. MCA Records, Inc.,* 134 A.D.2d 971, 520 N.Y.S.2d 891 (1st Dep't 1987). The matter was finally settled in 1989, and MCA began paying King all royalties due to him for the Muscle Shoals Masters. (J.A. 559) Fox and King did not discuss a fee for this litigation at its outset: Both assumed that it was covered under the original retainer agreement. (J.A. 91, 559)

Fox also represented King in a dispute in the late 1980s between the estates of former Lynyrd Skynyrd members. This lawsuit was brought in federal district court in Atlanta; Fox represented King's interests and traveled to Atlanta for three days, where he worked with King's local counsel (J.A. 92, 192–93, 558). Fox testified also that he participated in "weekly" settlement conferences on King's behalf until the matter was eventually resolved in or around 1989. (J.A. 92, 193)

During the pendency of these lawsuits, King brought up the fee arrangement between himself and Fox in a telephone conversation in 1986.[2] According to King,

[Fox] had said that [he] fought hard to win back the rights to [my] royalties, I should be grateful, and he also mentioned in that phone call that his, the fee arrangement was somehow tied in, I don't understand the exact language, but it was tied into the [1978] stipulation of settlement, and it was approved by the Judge or whatever, and he said he couldn't change it even if he wanted to.

(J.A. 294) King was under the impression that a court order had resulted from the lawsuit against MCA obligating him to pay Fox the one-third contingency fee, which "strongly intimidated" him from raising any further issues about Fox's fees. (J.A. 555) Fox was not questioned about the alleged court order comment under oath. He denies making the comment (Fox Br. at 14; J.A. 466), but makes no citation to sworn testimony to support his denial. King never asked for a copy of the court order.

In 1987, after having learned from fellow band members that it was unusual to be giving anyone a percentage of his writer's royalties (J.A. 269), King wrote to Fox asking him to stop taking his one-third contingency fee from his writer's royalties, because those had never been in jeopardy in the first place. Between 1978 and 1987, Fox had collected $55,000 in writer's royalties from King. (J.A. 270) Fox agreed to King's proposal and stopped taking King's writer's royalties (J.A. 94, 271), but did not return any writer's royalties he had collected to that point. He continued to collect one-third of King's artist's royalties.

**2.** In his brief, King argues that the court order conversation took place prior to 1986. However King testified unequivocally at the counterclaim trial that 1986 was the first and only time Fox mentioned the alleged court order to him (J.A. 294), and nowhere in his brief does he cite testimony to the contrary.

The fee arrangement continued after the conclusion of the Muscle Shoals and Atlanta lawsuits in 1989, and King was undoubtedly aware of its terms. When King's tax return was audited, he asked Fox confirm their one-third fee arrangement. Fox did so in a letter to the IRS dated April 18, 1988. (J.A. 467) Moreover, King did not seem to want to conclude his professional relationship with Fox. On January 31, 1990, King wrote Fox to express his appreciation for all of his help, and added, "I anticipate many legal problems in the future ... [s]o you'll be hearing from me!" (J.A. 532)

Fox represented King on several small matters in 1991 in connection with King's band Strawberry Alarm Clock (J.A. 651–57), but other than that, the two had no professional contact in the early 1990s. In 1995, while King was undergoing treatment for congestive heart failure, a clerk at MCA contacted King to verify his address, and at King's request, added his current address to all of his accounts. (J.A. 290) This transaction resulted in all of King's royalty checks being sent directly to King; because checks were no longer sent first to Fox, Fox was unable to deduct his one-third share from King's artist's royalties. By late 1996, King realized that he was receiving the full share of his artist's royalties (J.A. 562), and was afraid that he was violating "a court order of some kind" by denying Fox his contingency fee. (J.A. 293–94) When Fox finally called King to demand his payments on February 21, 1997, King explained to Fox that he no longer had the money, and did not contact Fox again. (J.A. 295) King then told the whole story to his new attorney John Shackelford, who told King that Fox had been taking advantage of him for years by collecting an illegal annuity. (J.A. 563) Several months after King consulted Shackelford, he filed this lawsuit.

Between 1978 and 1995, Fox collected $527,000 in fees from King: more than $104,000 in contingency payments on the two settlements, approximately $368,000 of King's artist's royalties, and $55,000 of his writer's royalties. (J.A. 270, 563)

B.  Procedural History

On June 4, 1997, King filed a complaint against Fox, alleging that his original agreement with Fox was unconscionable, and claiming breach of fiduciary duty, unjust enrichment, undue influence, conversion, and attorney misconduct. King demanded payment of the royalties improperly collected by Fox plus interest, as well as punitive damages and rescission of the fee agreement. (J.A. 470–93) Fox answered in December 1997 and filed a counterclaim for his share of the artist's royalties that King had withheld since 1995. (J.A. 494–503) In 1999, the District Court granted summary judgment on the primary claim, holding that Fox had ceased to act as King's attorney after 1990, therefore King's lawsuit was barred by the six-year statute of limitations governing the fee agreement. *King v. Fox*, No. 97 Civ. 4134, 1999 WL 135202, at \*3–5, 1999 U.S. Dist. LEXIS 2795, at \*8–\*13 (S.D.N.Y. Mar. 11, 1999).

While the summary judgment opinion dismissing King's claim was on appeal, Fox's counterclaim for fees withheld by King went to trial before Magistrate Judge Francis in September 2000. At the trial, the only two witnesses were King and Fox. The entire scope of their attorney-client relationship was brought out during the testimony, and the jury was asked to answer four questions, including:

(1) Has Mr. Fox ... established by a preponderance of the evidence that he and Mr. King had a meeting of the minds with respect to the retainer agreement, in that both parties agreed

that Mr. King would be bound to pay him one-third of all royalties ever after earned by Mr. King with respect to compositions and recordings that had any role in the dispute for which Mr. Fox provided legal services to Mr. King?

(2A) Has Mr. Fox established by a preponderance of the evidence that the contract was made in good faith without unfairness or overreaching, that is, it was fair, reasonable and fully known and understood by Mr. King as Mr. Fox's client?

(2B) Has Mr. Fox established by a preponderance of the evidence that his gain from the contingency fee was not so large in proportion to the services he rendered as to make the contract between him and Mr. King unconscionable?

(J.A. 444–445) The jury deadlocked on questions 1 and 2A, but returned a verdict of "No" on question 2B.[3] The court, after consultation with the attorneys, ruled that the jury's verdict on question 2B was sufficient to decide the issue—that is, if the jury felt that Fox had failed to prove that the contingency fee agreement was not unconscionable, then Fox could not prevail on his counterclaim even if he had proved any of the other elements. Judgment was entered for King. Fox initially appealed the verdict, but later withdrew the appeal.

In January 2002, this court vacated and remanded the District Court's 1999 opinion dismissing King's claim against Fox on statute of limitations grounds, holding that "the evidence tends to prove that Fox acted as King's lawyer through April 1995." *King v. Fox*, 28 Fed.Appx. 95, 99 (2d Cir. 2002). More depositions were taken after this court's opinion, and it became clear that Fox indeed had acted as King's attorney at least through 1991, if not later,

thereby barring Fox's statute of limitations argument entirely. On remand, the District Court once again granted summary judgment for Fox, holding that King ratified the fee agreement, and further, that his claim was barred by laches. The District Court also rejected, among others, King's collateral estoppel and unconscionability arguments. *King v. Fox*, No. 97 Civ. 4134, 2004 WL 68397, 2004 U.S. Dist. LEXIS 462 (S.D.N.Y. Jan. 14, 2004). This appeal followed.

## II. Discussion

King appeals the District Court's grant of summary judgment for Fox on several grounds. First, he claims that the verdict for King in the counterclaim trial before Magistrate Judge Francis should have collaterally estopped Fox to defend King's lawsuit. Second, he claims that the original contingency agreement between King and Fox was substantively unconscionable and therefore must not be enforced. Third, he argues that the defenses of ratification and laches are not applicable here.

We affirm the judgment on the issue of collateral estoppel. However, because New York law is uncertain on whether a client may ratify an attorney's fee agreement, generally, and in cases of fraud or unconscionability, specifically, we certify three questions related to those issues to the New York Court of Appeals.

### A. Collateral Estoppel

King claims that the doctrine of collateral estoppel dictates that the counterclaim jury's verdict in his favor should bar Fox from defending the instant action.

The New York law of collateral estoppel involves a two-part test: "[A] par-

---

**3.** A "Question 3" was also presented to the jury, but there is no record of what it was, and apparently the jury did not render a verdict as to that question.

ty is estopped from relitigating an issue when that issue was necessary to the resolution of the prior action, and the party against whom estoppel is invoked had a full and fair opportunity to contest that issue in previous litigation." *PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 491 (2d Cir.2004). Collateral estoppel "is an equitable doctrine—not a matter of absolute right. Its invocation is influenced by considerations of fairness in the individual case." *Id.* at 493. Factors to be considered when determining whether there was a full and fair opportunity to litigate the issue in the prior action include "the size of the claim, the forum of the prior litigation, the use of initiative, the extent of the litigation, the competence and experience of counsel, the availability of new evidence, indications of a compromise verdict, differences in the applicable law and foreseeability of future litigation." *Gilberg v. Barbieri*, 53 N.Y.2d 285, 292, 441 N.Y.S.2d 49, 51, 423 N.E.2d 807 (1981).

▆▆▆ The District Court held that there was no identity of issues between the counterclaim trial and the instant lawsuit, because the counterclaim concerned money that owed to Fox and withheld by King between 1995 and 2000, and this action concerns fees collected by Fox between 1978 and 1995. *King*, 2004 WL 68397, at *3–4, 2004 U.S. Dist. LEXIS 462, at *9–*10. King notes that the questions posed to the counterclaim jury were not limited to the time period covered by the counterclaim (1995–2000), and that the bulk of the testimony at trial pertained to Fox's representation of King prior to 1995; he argues that when the jurors considered the acceptability of the fee agreement, they must have had the entire scope of representation in mind, and that their decision in his favor should collaterally estop Fox to argue that the fee agreement was not unconscionable.[4]

It is indeed possible that the counterclaim jury's verdict was based on the entire period of representation. But it also is possible that the verdict was based solely on the time period covered by the counterclaim, especially given that Fox did virtually no work on King's behalf during that period. We agree with the District Court that King has not carried his burden to show "with clarity and certainty what was determined by the prior judgment . . . ." *BBS Norwalk One v. Raccolta, Inc.*, 117 F.3d 674, 677 (2d Cir.1997) (internal quotation marks omitted). Therefore, Fox is not collaterally estopped to defend against King's appeal.[5]

---

**4.** Under New York law, the burden to prove the conscionability of an attorney's fee agreement always rests on the attorney. *Greene v. Greene*, 56 N.Y.2d 86, 92, 451 N.Y.S.2d 46, 49, 436 N.E.2d 496 (1982). This burden does not switch depending on who is the plaintiff. Therefore, if collateral estoppel otherwise applied in this case, that burden would remain on Fox, even though he was the plaintiff in the counterclaim and is the defendant here.

**5.** It is worth noting that the issue of unconscionability probably should not have been decided by the counterclaim jury. *See McNally Wellman Co. v. New York State Elec. & Gas Corp.*, 63 F.3d 1188, 1198 (2d Cir. 1995) ("[T]he determination of unconscionability is a question of law"); *Wilson Trading*

*Corp. v. David Ferguson, Ltd.*, 23 N.Y.2d 398, 403–04, 297 N.Y.S.2d 108, 112, 244 N.E.2d 685 (1968) ("Whether a contract or any clause of the contract is unconscionable is a matter for the court to decide against the background of the contract's commercial setting, purpose, and effect . . . ."); *Estate of Arena v. Abbott & Cobb, Inc.*, 158 A.D.2d 926, 926, 551 N.Y.S.2d 864, 865 (4th Dep't 1990) ("[T]he court erred in submitting to the jury the question of whether the limitation of damages clause was unconscionable because unconscionability is a question of law to be decided by the court."). However, both parties consented to submit the issue of unconscionability to the counterclaim jury, Fox did not appeal the verdict the jury rendered, and

## B. Ratification

The District Court held that King's claims were barred because King ratified the contingency agreement by accepting its terms and benefits between 1975 and 1995. *King*, 2004 WL 68397, at *8, 2004 U.S. Dist. LEXIS 462, at *22. King asserts that res judicata bars Fox from arguing ratification here because Fox did not argue ratification at the counterclaim trial. He claims also that he could not have ratified the fee agreement because he was fraudulently induced to do so. Finally, King maintains that the agreement with Fox was unconscionable and should not be enforced. Fox counters that his ratification argument is not barred by res judicata because the counterclaim trial covered a time period and subject matter different from those in the instant action. Further, Fox argues that the fee agreement was not unconscionable and that no fraud occurred.

We find that Fox's ratification argument is not barred by res judicata. However, we ask the New York Court of Appeals for guidance on whether a client may ratify a fee agreement with his attorney during a period of continuous representation in any of three circumstances—generally, or where that agreement was perpetuated by fraud or found to be unconscionable.

### 1. *Res Judicata*

■ Although King did not raise the issue of res judicata in the District Court, there is "no absolute bar" to the consideration of res judicata claims for the first time on appeal. *Salahuddin v. Jones*, 992 F.2d 447, 449 (2d Cir.1993). "Under the doctrine of res judicata, or claim preclusion, '[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'"

*Legnani v. Alitalia Linee Aeree Italiane, S.p.A.*, 400 F.3d 139, 141 (2d Cir.2005) (quoting *St. Pierre v. Dyer*, 208 F.3d 394, 399 (2d Cir.2000)). Two causes of action may be parallel but distinct. As this court has explained:

'[T]he fact that both suits involve[ ] essentially the same course of wrongful conduct is not decisive; nor is it dispositive that the two proceedings involved the same parties, similar or overlapping facts, and similar legal issues. A first judgment will generally have preclusive effect only where the transaction or connected series of transactions at issue in both suits is the same, that is where the same evidence is needed to support both claims, and where the facts essential to the second were present in the first.'

*Interoceanica Corp. v. Sound Pilots*, 107 F.3d 86, 91 (2d Cir.1997) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1463–64 (2d Cir.1996)).

■ As noted above in the discussion of collateral estoppel, the issue being decided at the counterclaim trial concerned fees withheld by King between 1995 and 2000. This appeal concerns fees charged by Fox between 1976 and 1995. The evidence needed to support a ratification claim in the counterclaim trial is different from the evidence needed to support such a claim in this action. In this appeal, Fox argues that King ratified the fee agreement between 1978 and 1986—when King knew and accepted the terms of the agreement and before Fox had mentioned the alleged "court order" mandating the fee agreement. At the counterclaim trial, where Fox sought fees he was owed between 1995 and 2000, Fox would have had to argue that King had ratified the fee agreement after Fox's alleged fraudulent court order assertion. Fox's pre-fraud ratifica-

the counterclaim judgment in King's favor is now final.

tion defense would not have been relevant at the counterclaim trial, and indeed it was not argued there. Because Fox was not bound to argue pre-fraud ratification in that proceeding, res judicata cannot preclude him from doing so in this appeal.[6]

### 2. *Fraud*

■ King claims that he could not have ratified the fee agreement because Fox fraudulently convinced him that the agreement was mandated by a court order. Fox denies that the court order conversation occurred, although he provides no citation to sworn testimony to support this denial. He argues also that King ratified the fee agreement years before the alleged court order conversation, rendering any alleged fraudulent conduct moot. We must decide whether King ratified the fee agreement, either before or after the alleged fraud occurred.

It is undisputed that the alleged court order conversation did not occur until 1986.[7] By then, the fee agreement had been in effect for more than 10 years, and King had asked Fox to represent him in a total of three lawsuits. King does not allege that Fox deceived him in any significant way between 1975 and 1986. He describes the pressure Fox put on him to sign the settlement agreement, including Fox's dubious representations about his ability to recover King's funds promptly if

King delayed signing, and he complains that Fox made him feel guilty by emphasizing all the work that had been done on his behalf. But Fox never told King that he was bound to accept the fee agreement in order to go through with the settlement, nor does King allege that Fox affirmatively deceived him as to the content or circumstances of the agreement at any time between the signing of the agreement and 1986. King claims that he was not aware that the agreement applied in perpetuity until 1978, but this ignorance did not stem from any alleged fraud on Fox's part. From 1978, when King learned definitively the nature of the agreement, until 1986 when the alleged fraud occurred, King allowed the agreement to proceed, and he does not allege that Fox utilized any deception to keep it alive. Indeed, he reaped benefits from the agreement by receiving legal services from Fox in three cases.

If this were a typical contract case, King's eight years of acquiescence in the agreement with full knowledge of its terms between 1978 and 1986 would be enough under New York law to show that he ratified the agreement. *See, e.g., Benjamin Goldstein Prods., Ltd. v. Fish,* 198 A.D.2d 137, 138, 603 N.Y.S.2d 849, 851 (1st Dep't 1993) (holding that a party's knowing acceptance of benefits from a contract for more than one year after the agreement was executed constituted ratification,

---

**6.** At the counterclaim trial, during deliberations, the jury sent a note raising the issue of whether King had ratified the fee agreement, asking if the "meeting of the minds" on the fee agreement had to occur "at the initial signing of the retainer" or if it could occur at a later date. (J.A. 422) Magistrate Judge Francis refused Fox's attorney's request to allow the jury to consider ratification, describing it as a new theory, not discussed at trial and not appropriately presented to the jury at that point. (J.A. 425) Although the jury's inquiry as to whether a "meeting of the minds" could occur after the retainer agree-

ment was signed suggests the concept of ratification, that concept was never argued or submitted to the jury for decision, and in any event the jury deadlocked on the "meeting of the minds" question.

**7.** *See supra* note 2 (noting that despite King's equivocation about the exact date of the court order conversation in his appellate brief, at the counterclaim trial, King testified that the first and only time Fox mentioned a court order mandating his contingency fee was in 1986).

and barred the party from alleging economic duress in the execution); *Sheindlin v. Sheindlin,* 88 A.D.2d 930, 931, 450 N.Y.S.2d 881, 882 (2d Dep't 1982) ("A party who executes a contract under duress and then acquiesces in the contract for any considerable length of time, ratifies the contract.") (citation omitted).

However, attorney's fee agreements have been held to different, and often higher, standards than ordinary contracts. These different standards seem in part to exist because the courts have "traditional authority . . . to supervise the charging of fees for legal services under [their] inherent and statutory power to regulate the practice of law." *First Nat'l Bank v. Brower,* 42 N.Y.2d 471, 474, 398 N.Y.S.2d 875, 876, 368 N.E.2d 1240 (1977) (citations omitted). Under the continuous representation doctrine, the statute of limitations for a client's malpractice suit against his attorney is tolled until the attorney-client relationship is completed. *See Glamm v. Allen,* 57 N.Y.2d 87, 94, 453 N.Y.S.2d 674, 678, 439 N.E.2d 390 (1982). As the New York Court of Appeals has explained, the continuous representation rule

> recognizes that a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith, and realistically cannot be expected to question and assess the techniques employed or the manner in which the services are rendered. . . . A client who entrusts his assets to an attorney for professional assistance often faces the same dilemma as the client who entrusts his case to an attorney for possible litigation. In neither instance can the client be expected, in the normal course, to oversee or supervise the attorney's handling of the matter, and thus in neither case is it realistic to say that the client's right of action accrued

before he terminated the relationship with the attorney.

*Greene v. Greene,* 56 N.Y.2d 86, 94–95, 451 N.Y.S.2d 46, 50–51, 436 N.E.2d 496 (1982); *see also Icahn v. Todtman, Nachamie, Spizz & Johns, P.C.,* No. 99 Civ. 11783, 2001 WL 1160582, at *2, 2001 U.S. Dist. LEXIS 15487, at *8 (S.D.N.Y. Oct. 1, 2001) (" '[T]he client has the right to presume the professional's ability and good faith, and realistically cannot be expected to question and assess the techniques employed or the manner in which the services are rendered . . . or to jeopardize his pending case or his relationship with the attorney handling that case.' ") (quoting *Glamm,* 57 N.Y.2d 87 at 93, 453 N.Y.S.2d at 678, 439 N.E.2d 390 (1982)). The fiduciary relationship between attorney and client protects the client from having to file suit against his attorney during the period of representation—the time when a client is encouraged and expected to trust that his attorney is acting in his best interests.

Although the continuous representation rule prevents the operation of the statute of limitations in an attorney-client dispute, New York courts have not spoken definitively on whether a client may ratify an attorney-client agreement during a period of continuous representation, either generally, or if fraud has occurred during that period. In *Schlanger v. Flaton,* 218 A.D.2d 597, 603, 631 N.Y.S.2d 293, 297–98 (1st Dep't 1995), the First Department rejected an attorney's claim that his client had ratified his allegedly improper conduct because the client had not filed suit until three years after he might have learned of the attorney's misconduct. The Court held that neither ratification nor laches applied, because the attorney had been the client's "attorney and advisor" until two months before the suit was filed, and even assuming the client had been aware of the

attorney's misconduct when it occurred, "a three-year delay is hardly so excessive as to warrant the imposition of laches and/or ratification." *Id.* at 603, 631 N.Y.S.2d at 297–98. *Schlanger* implies that a client should not be held to ratify his attorney's misconduct until the attorney-client relationship is over, or until the client has been aware of the misconduct for a lengthy period. *See also Greene v. Greene,* 80 A.D.2d 55, 59, 437 N.Y.S.2d 339, 342 (1st Dep't 1981), *aff'd* 56 N.Y.2d 86, 451 N.Y.S.2d 46, 436 N.E.2d 496 (1982) (noting that there can be no ratification of an attorney's fee agreement unless the client "approved the acts of defendants with knowledge that she allegedly had a cause of action against them.").

In this case, this court has already held that the attorney-client relationship was in effect until at least 1991, if not later, *see King,* 28 Fed.Appx. 95, 99, and King alleges that he did not learn of Fox's misconduct until 1997 when he consulted with a new attorney. King filed this action less than four months after learning that Fox could not have been telling the truth about the alleged court order.

However, at least one court has held that an attorney's fee agreement, even when induced by fraud, may be ratified when the client accepts benefits under that agreement. *Ballow Brasted O'Brien & Rusin, P.C. v. Logan,* No. 03–Civ–74, 2004 WL 178343, at *1, 2004 U.S. Dist. LEXIS 16264, at *4 (W.D.N.Y. Aug. 10, 2004). Also, we must not forget that King accepted the benefits of the fee agreement for a period of approximately 10 years prior to the alleged fraud.

Therefore we are left with several questions relating to the New York law of attorney-client fee agreements. First, is it possible for a client to ratify such an agreement at all during the course of representation? That is, by accepting the terms of the original fee agreement for a period of 10 years prior to Fox's alleged fraudulent conduct, did King necessarily ratify those terms? Second, is it possible to ratify an attorney's fee agreement if misconduct has occurred during the course of the representation? Specifically, if King could prove that Fox defrauded him in 1986, would this misconduct prevent Fox's ratification defense, either prior to or after the alleged fraud?

### 3. *Unconscionability*

■ King has argued also that the original fee agreement he signed with Fox was unconscionable. The court believes that there is at least an issue of material fact as to the conscionability of the agreement; however, if it is possible under New York law for a client to ratify an unconscionable fee agreement, the unconscionability determination is moot because it is undisputed that King knew of and accepted the terms of the agreement at least between the years 1978 and 1995.

■ The District Court held that the fee agreement between King and Fox was not unconscionable, stating that a one-third contingency fee was "standard throughout the state and country," and holding that "[s]ubstantive unconscionability is not triggered because a contract provision in a case happens to benefit one side." *King,* 2004 WL 68397, at *8, 2004 U.S. Dist. LEXIS 462, at *19. However, the District Court did not apply the test traditionally employed by New York courts to gauge the conscionability of attorney's fee agreements, which dictates that:

Contingent fees may be disallowed as between attorney and client in spite of contingent fee retainer agreements, where the amount becomes large enough to be out of all proportion to the value of the professional services rendered....

[T]he amount of the fee, standing alone and unexplained, may be sufficient to show that an unfair advantage was taken of the client or, in other words, that a legal fraud was perpetrated on him.

*Gair v. Peck*, 6 N.Y.2d 97, 106, 188 N.Y.S.2d 491, 497–98, 160 N.E.2d 43 (1959); *see also Williamson, P.A. v. John D. Quinn Constr. Corp.*, 537 F.Supp. 613, 617 (S.D.N.Y.1982) (Weinfeld, J.) ("An agreement will not be enforced where the compensation sought is excessive, or out of proportion to the value of the attorney's services.") (internal quotation marks omitted). In attorney-client contracts, the burden is on the attorney

> to establish affirmatively that [the contract] was made by the client with full knowledge of all the material circumstances known to the attorney, and was in every respect free from fraud on his part, or misconception on the part of the client, and that a reasonable use was made by the attorney of the confidence reposed in him. Under this rule it is not necessary for the client to show that the agreement was obtained by fraud or undue influence on the part of the attorney although, of course, that would make the agreement unenforceable if it were proven. Even in the absence of such misconduct the agreement may be invalid if it appears that the attorney got the better of the bargain, unless he can show that the client was fully aware of the consequences and that there was no exploitation of the client's confidence in the attorney.

*Greene*, 56 N.Y.2d at 92, 451 N.Y.S.2d at 49, 436 N.E.2d 496 (internal quotation marks omitted).

The District Court held that unconscionability must be assessed at the time the contract is made, *King*, 2004 WL 68397, at *8, 2004 U.S. Dist. LEXIS 462, at *18, but courts have held to the contrary when attorney's fee agreements are in dispute. *See 520 East 72nd Comm. Corp. v. 520 East 72nd Owners Corp.*, 691 F.Supp. 728, 738 (S.D.N.Y.1988) ("The vice in a contingency arrangement may be determined not only by whether the contract was fair in the first instance but also by whether it became unfair in its enforcement.") (citing *In re Friedman*, 136 A.D. 750, 751–52, 121 N.Y.S. 426, 428 (2d Dep't 1910) ("[T]he recovery may be such that what was in the first instance a fair contract becomes unfair in its enforcement.")); *see also McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 101 (3d Cir.1985) (holding that it was legal error for the District Court to restrict its unconscionability determination to the terms of the attorney's fee agreement because "the results obtained, the quality of the work, and whether the attorney's efforts substantially contributed to the result are all factors that have been used by courts in reviewing the reasonableness of contingent fees.").

The court must make its unconscionability determination after a "full exploration of all the facts and circumstances" surrounding the agreement, including the intent of the parties and the value of the attorney's services in proportion to the fees charged. *See Gross v. Russo*, 47 A.D.2d 655, 655, 364 N.Y.S.2d 184, 186 (2d Dep't 1975) (citing cases); *Bizar & Martin v. U.S. Ice Cream Corp.*, 228 A.D.2d 588, 588–89, 644 N.Y.S.2d 753, 754 (2d Dep't 1996) (noting that the reasonableness of attorney's fee agreements is "always subject to court scrutiny" and that the attorney "has the burden of showing that a fee contract is fair, reasonable, and fully known and understood by the client.").

There is no magic number that makes a contingency fee agreement automatically unconscionable. Indeed, New York courts have upheld agreements awarding attor-

neys as much as fifty percent of their clients' recoveries. *See, e.g., Beadwear, Inc. v. Media Brands, LLC,* No. 00 Civ. 5483, 2001 WL 1622207, at *2, 2001 U.S. Dist. LEXIS 20927, at *5 (S.D.N.Y. Dec. 18, 2001); *Sea Isle Foods, Inc. v. State,* 40 Misc.2d 872, 874, 244 N.Y.S.2d 613, 615 (Ct. Claims 1963). The court's inquiry must focus on the circumstances of the agreement and the work performed. This court considered facts similar to those presented here in *Shiya v. Nat'l Comm. of Gibran,* 381 F.2d 602 (2d Cir.1967). In that case, George Shiya, an attorney, had an agreement with the author Kahlil Gibran's estate that if Shiya was able to secure renewal copyrights for the estate, he would receive twenty-five percent of the renewal copyright earnings. Shiya secured the rights after "considerable litigation," 381 F.2d at 603, and more litigation followed over whether Shiya was entitled to Gibran's future royalties or simply to those accumulated at the termination of the litigation. The court found that the retainer agreement was ambiguous, but that there was a meeting of the minds that "[t]he prize sought in the litigation . . . was the full fruits of the renewal copyrights." *Id.* at 607. The court found no deception on Shiya's part, and held that if Shiya ended up earning a considerable sum, this was "only so because the subject of the litigation . . . turned out to be of substantial value." *Id.* at 609.

In this case, however, it is debatable whether there was a meeting of the minds at the time of the agreement's signing as to the "prize sought." John Groon's October 1978 letter to Fox asking whether Fox would be paid future royalties is evidence that King was theretofore unsure whether this was the case. (J.A. 529) Additionally, Allen Grubman, the attorney who secured a royalty advance for King, charged King one-third of that recovery and never asked for anything more; King claims that he

assumed that Grubman's colleague Fox would do the same. Moreover, in contrast to *Shiya,* this case contains allegations of deception on the attorney's part. Fox and King dispute whether Fox explained the full ramifications of the fee agreement to King at the time it was signed. They also dispute whether Fox manipulated King into accepting the fee arrangement by forcing King to sign the 1978 settlement agreement under time pressure generated by false statements; whether Fox told King that he could never adequately be repaid for his services; and whether Fox informed King that a court order existed mandating the fee arrangement. Finally, the sheer amount of the fee Fox collected—over $500,000 for modest work on three lawsuits—could support a finding of unconscionability.

Therefore, there appears to be at least an issue of material fact as to the unconscionability of the original fee agreement between King and Fox. The question then arises, is it possible for a client to ratify an unconscionable attorney's fee agreement? New York courts have not spoken definitively on the issue. Several old New York state cases indicate that an unconscionable or otherwise voidable agreement may be ratified. *See Kent v. Quicksilver Mining Co.,* 78 N.Y. 159, 190 (1879) ("[A]n unconscionable arrangement will not be disturbed when there has been ratification of it with knowledge of all its bearings, after time has been had for consideration."); *Jones v. DeRonde,* 142 Misc. 831, 255 N.Y.S. 505 (1932) (holding that a customer ratified unconscionable acts by stockbrokers by giving them more funds and asking them to conduct more trades); *cf. Ferguson v. Lion Holding, Inc.,* 312 F.Supp.2d 484, 500 (S.D.N.Y.2004) ("[U]nder New York law, a party may 'ratify' a voidable contract by accepting benefits flowing from it, and thereby waive the

right to rescind the contract."); *Prudential Ins. Co. v. BMC Industries, Inc.*, 630 F.Supp. 1298, 1300 (S.D.N.Y.1986) ("By her own acts or words, a party may ratify what would otherwise be a questionable contract.").

However, none of the above cases concern attorney-client agreements, and other courts have held that unconscionability voids an agreement, making ratification impossible, especially in the attorney-client or fiduciary context. *See Hellier v. Baush Mach. Tool Co.*, 21 F.2d 705, 707 (1st Cir.1927) (noting that "ratification is futile" if there is unfairness in the transaction); *Lachman v. Bell*, 353 F.Supp. 37, 41 (S.D.N.Y.1972) ("Ratification does not make an unconscionable deal conscionable merely because most of the stockholders were either indifferent or actually in sympathy with the director's scheme.") (internal quotation marks omitted); *Walton v. Hoover, Bax & Slovacek, LLP*, 149 S.W.3d 834, 846–47 (Eighth Dist.2004) (refusing to ratify an unconscionable attorney's fee agreement because it was against public policy and stating that "a contractual provision that violates public policy cannot be ratified"); *Blattman v. Gadd*, 112 Cal.App. 76, 97, 296 P. 681, 689 (1st App. Dist.1931) (holding that an attorney's fee agreement was unconscionable and void, and therefore incapable of being ratified).

The authorities are divided and scant on the issue of whether an unconscionable attorney's fee agreement may be ratified by a client; we therefore certify that question to the New York Court of Appeals as well.

### III. Conclusion

For the reasons stated, we hereby certify the following questions to the New York Court of Appeals:

1. Is it possible for a client to ratify an attorney's fee agreement during a period of continuous representation?

2. Is it possible for a client to ratify an attorney's fee agreement during a period of continuous representation if attorney misconduct has occurred during that period? If so, can ratification occur before the attorney has committed the misconduct?

3. Is it possible for a client to ratify an unconscionable attorney's fee agreement?

The Court of Appeals may expand these certified questions to address any further relevant questions of New York law it deems to be involved in this appeal. This panel retains jurisdiction and will consider any issues that may remain on appeal once the New York Court of Appeals has either provided us with guidance or declined certification. If the Court of Appeals answers that it is not possible for a client to ratify an attorney's fee agreement, either generally, or in the case of fraud or unconscionability, the case will be remanded for trial on the issues of fraud and unconscionability.

It is therefore ORDERED that the Clerk of this court transmit to the Clerk of the Court of Appeals of the State of New York a Certificate, as set forth below, together with a complete set of briefs, appendices, and the record filed in this court by the parties.

### IV. Certificate

The foregoing is hereby certified to the Court of Appeals of the State of New York, pursuant to 2d Cir. R. § 0.27 and N.Y. Comp.Codes R. & Regs. tit. 22, § 500.17, as ordered by the United States Court of Appeals for the Second Circuit.