**Richard SMITH, Plaintiff,**

v.

**The EDUCATION PEOPLE, INC., and Gary Zweig, Defendants.**

**No. 03–CV–1856 (RO).**

United States District Court, S.D. New York.

Dec. 16, 2005.

**24.** *See* Compl. ¶¶ 101–135.

**25.** *See id.* ¶¶ 136–168.

**26.** *See id.* ¶¶ 8, 86–88, 169–176.

**138**

Lance J. Gotko, Friedman Kaplan Seiler & Adelman LLP, New York City, for Plaintiff Smith.

Kenneth W. Africano, Harter Secrest & Emery, LLP, Buffalo, NY, for Defendants.

## OPINION & ORDER

OWEN, District Judge.

Plaintiff Richard Smith, a graphic artist, and Defendants The Education People ("TEP") and its President Gary Zweig, were formerly parties to an exclusive license agreement under which Smith designed educationally-themed artwork for TEP to use on products (such as pins and the like, sold to teachers, children, parents and so forth), advertised in and sold through TEP catalogs. Plaintiff Smith commenced the instant litigation in 2003, claiming that defendants intentionally—willfully—infringed approximately six different art works of his. On summary judgment, this Court dismissed all but two claims—a willful copyright infringement claim relating to a certain "Gold Circle of Kids" pin, and a breach of contract claim relating to another lapel pin. Defendants had earlier admitted sales of these products, but claimed that the infringement was unintentional, not willful. After a week long trial in March 2005, the jury, while finding the admitted infringement, determined that it was *unintentional*, as defendants had claimed, and awarded $30,000 in statutory damages on the claim, and $500 of damages

on the breach of contract claim. Plaintiff's appeal from that verdict is pending in the Second Circuit. Before me now is defendants' subsequently-filed motion for collateral injunctive relief, pursuant to the All Writs Act, 28 U.S.C. § 1651(a), to stop plaintiff Smith from proceeding with two other lawsuits alleging *intentional* copyright infringement that Smith has recently filed in the Federal Courts of Maine and Illinois against other parties, based on issues already litigated in this Court. Defendants also seek sanctions and additional injunctive relief to stop plaintiff Smith from what defendants see as harassment of its vendors and customers, and to prevent Smith from further defaming TEP and otherwise interfering with TEP's business.

Plaintiff Smith contends that this injunction is improper because he is not abusing the judicial system, but only attempting in good faith to vindicate his rights through the legal process. I am unable to agree.

 In determining whether or not to restrict a litigant's questionable future access to the courts, the Second Circuit, in *Safir v. U.S. Lines, Inc.,* 792 F.2d 19, 24 (2d Cir. 1986), has listed the following factors for consideration: "(1) the litigant's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the litigant's motive in pursuing the litigation, e.g., does the litigant have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by counsel; (4) whether the litigant has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties." After hearing extensive testimony from Smith, as well as from a now co-plaintiff in the Maine Action, a Paul A. Kelley, Jr. (who also appears as a *pro se* plaintiff, yet signed the Maine Amended Complaint in October 2005 as Manager of a corporation AquaFortis LLC [1]), I answer the ultimate question of whether this plaintiff

**1.** It is well-settled law that a corporation cannot appear in the federal courts *pro se. See Rowland v. California Men's Colony,* 506 U.S. 194, 201–203, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993) ("It has been the law for the better part of two centuries ... that a corporation may appear in the federal courts only through licensed counsel.").

and Mr. Kelley are likely to continue to abuse the judicial process and harass other parties in the affirmative. *Id.; see* Hr'g Tr. 143–46, Nov. 18, 2005.

█ In consideration of these factors, and after reviewing the record, I have no doubt that the circumstances here call for some restriction on their efforts to float future federal litigation in this area. Merely a month after the above issues were adjudicated in this court, Mr. Smith filed a Summons and Complaint in the Northern District of Illinois against various bystander parties of TEP, namely Berlin Industries, Inc., the company that prints and mails the mail-order TEP catalogs; and Bookcrafters, Inc., the company that produces said catalogs, and its principals, Erika and Gene Deroin, charging them, *inter alia*, with *intentional* copyright infringement.[2] Only three months later, Mr. Smith filed his next Summons and Complaint in federal court for the District of Maine, alleging, *inter alia*, the same *intentional* copyright infringement against Pat & Jane Emblems, Inc., a Taiwanese corporation that manufactured the Gold Circle of Kids pin for TEP. This complaint was recently amended to include as named defendants: Patrick Chu, a principal of Pat & Jane Emblems, Inc.; Metro–Pack, Inc., a warehouse assembly, distribution and storage facility, and its president John Sgombeck; Berlin Industries, Inc. (*again*), and its principal Bruce M. Smith. The willful infringement claims in both the Illinois Action and the Maine Action arise out of precisely the same facts as those asserted against TEP in this court earlier this year, and also involve some of the same artworks.

As a threshold matter, these claims are collaterally estopped,[3] for in Smith's earlier action before me, the jury was specifically asked by plaintiff Smith to find *willful* infringement, but returned a verdict of *unintentional* infringement. The issue and claim in these new lawsuits are precisely the same as those which were resolved in the prior litigation, where plaintiff Smith had a full and fair opportunity to present them; no controlling facts or legal principles have changed whatsoever since the prior proceeding; and no special circumstances warrant an exception to the standard rules of preclusion. *See Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 146 (2d Cir.2005) (citations omitted); *King v. Fox*, 418 F.3d 121, 129–130 (2d Cir. 2005) (citations omitted); *Whimsicality, Inc. v. Battat*, 27 F.Supp.2d 456, 462–63 (S.D.N.Y. 1998) (citations omitted); *see also Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 97 (2d Cir. 1997) ("final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.") (citations omitted).

Indeed, Mr. Smith has repeatedly asserted the same claims of intentional infringement against essentially all parties who have done business with TEP at any time, starting long prior to any animosity between the parties and continuing up through the present, and it is reasonable to anticipate that he will begin to assert claims against anyone in possession of a catalog published or mailed out, no matter how many years ago,[4] which may bear a photograph of a product utilizing any of his designs. *See* Hr'g Tr. 95–100. Yet plaintiff Smith cannot reasonably expect to recover in all of these suits against mere

---

**2.** The parties named as defendants in the Illinois Action do not sell the end product; rather, TEP does. Although the complaint is notably lacking mention of publication dates and product information, Smith argues that his copyrights are harmed by the fact that pictures of product(s) that utilized his designs were included in catalogs published and distributed approximately 3 years ago, quite prior to the suit before me as well as to the signing of an earlier settlement agreement. *See, e.g.*, Hr'g Tr. 92, 95, 98. Smith also claims that pictures of his artwork have appeared in more current catalogs, but he has no evidence of any sales of the products which allegedly appear therein. *Id.* at 99–100.

**3.** This doctrine "bars a party from relitigating in a second proceeding an issue of fact or law that was litigated and actually decided in a prior proceeding, if that party had a full and fair opportunity to litigate the issue in the prior proceeding and the decision of the issue was necessary to support a valid and final judgment on the merits." *Computer Associates International, Inc. v. Altai, Inc.*, 126 F.3d 365, 371 (2d Cir.1997) (citation omitted).

**4.** Over a million TEP catalogs are sent out every year.

bystander parties—such as warehousemen, catalog distributors and catalog possessors—or corporate officers as to whom Smith has no knowledge did anything to willfully infringe his copyrights.

Smith's attitude in this regard is starkly revealed in the following excepts from his testimony at the November 18, 2005 hearing before me: [5]

THE COURT: Are you saying that if TEP sent out a catalog in 2002, that has your artwork on it to vendors, and if you got a hold of a list of vendors, are you entitled according to you to send every vendor a letter saying something about the fact that you may be infringing my artwork? Is that what you're telling me? ... They have your pictures of your stuff in it. I'm talking like 2002 before all of this stuff blew up. And it landed on people's desks, and maybe today's on top of a bookcase somewhere. Are you planning—that entitles you to write to them and threaten them with suit if they do anything?

THE WITNESS: I believe the copyright law entitles me to exclusive rights of my artwork.

THE COURT: No question about that. Do you have a right to write a vendor and say you got a catalog of mine and I am warning you about selling this?

THE WITNESS: The catalogs are not mine. The artwork—some of the artwork in the catalogs is mine.

THE COURT: Is yours.

THE WITNESS: Yes.

THE COURT: Okay. That authorize you to assume that a vendor is going to sell it, 2002 catalog?

THE WITNESS: As the record in the court showed, sales came from various catalogs at various times.

THE COURT: Right. That's the way the world works. We're now in 2005. You got anything indicating any vendor is selling anything? Today as you sit here?

THE WITNESS: Selling?

THE COURT: Yes.

THE WITNESS: There are other protections of the copyright.

THE COURT: No, no. You're not answering.

THE WITNESS: Besides selling.

THE COURT: Do you have any indication any of these people that got catalogs before any of this problem began, got catalogs before, are now out there violating your copyrights?

THE WITNESS: Yes.

. . .

THE COURT: What evidence do you have that there is a violation of your copyrights?

THE WITNESS: There are items that I believe that are infringing my copyrights.

THE COURT: Where?

THE WITNESS: That are in—current catalogs and it is ongoing.

THE COURT: Do you have any records of that?

THE WITNESS: Records?

THE COURT: Yes.

THE WITNESS: I have the catalogs.

THE COURT: Okay. Have you checked against stores and said ah-ha the XYZ store in Camden, Maine, is selling this; anything like that?

THE WITNESS: Their products aren't sold through stores.

THE COURT: How are they sold?

THE WITNESS: They're sold by phone, fax, and Website.

THE COURT: Okay. Have you got any evidence that anything was sold by phone, fax or Website?

THE WITNESS: No.

* * *

QUESTION [Africano]: Sir, despite the fact that Judge Owen said TEP had the right to sell the Reaching Hands pin, you are now trying to sue Berlin Industries and Bookcrafters and the owners of those companies for publishing catalogs that have pictures of Reaching Hands in them; isn't that true?

ANSWER [Smith]: Among other things.

5. Hr'g Tr. 98–100, 104, 109, 112.

QUESTION: That's one of the things you are suing for?

ANSWER: Yes.

* * *

QUESTION: Are you trying to sue [Pat & Jane Emblems in the Maine lawsuit] for things that existed prior to you signing the settlement agreement?

ANSWER: Yes, among—yes.

QUESTION: That's true even though you provided a general release to TEP that covered all of TEP's licensees, agents, representatives?

ANSWER: Correct.

* * *

QUESTION: I guess, but the answer is that you didn't know whether or not Bruce Smith was personally involved in the printing of the TEP catalogs, correct?

ANSWER: He is the president of a company so—

THE COURT: That's not the question to you. Did you know that he was personally involved?

THE WITNESS: I believed as the president he was personally involved.

THE COURT: Did you know?

THE WITNESS: I did not know.

Mr. Smith had his day in court, and lost with regard to the alleged willful infringement of the sales of a small number of the Gold Circle of Kids pin. He continues to drive up the attorney's fees and expenses of TEP and its vendors,[6] and is unduly burdening the courts with multiple suits pertaining to the same already adjudicated *unintentional* sales of approximately $15,144 worth of pins.[7] This can be viewed only as attempts by Smith to harass the defendants, its vendors and customers. *See* Hr'g Tr. 144–45.[8]

In this he has enlisted his friend Kelley, as to whom two particular paragraphs of the Maine Amended Complaint are revelatory:

67. Since obtaining a public judgment of infringement and breach of contract against TEP, Smith has undertaken the task of notifying third parties of said judgment and other elements of the public record, and demanded that such third parties cease and desist from any current and/or future activity which may infringe upon his Intellectual Property, or interfere with his contracts . . .

68. To this end . . . Smith has been aided by AquaFortis LLC, a Maine State Corporation with which he has had a long-standing relationship, and with which he maintains an ongoing personal and professional relationship. In recognition both of past services rendered and prospective economic advantage, Smith has granted to AquaFortis consideration in furtherance of this relationship.

Given this objective vexatious and harassing abuse of the judicial process, and despite plaintiffs' claimed good faith subjective assertion that they have suffered, and continue to suffer, an unremedied injury, I hereby permanently enjoin Messrs. Smith and Kelley from instituting further duplicative actions, motions, petitions or proceedings in *any* courts, federal or state, arising from or relating to the copyright and contract claims that were adjudicated by this court on summary judgment and by a jury at trial in 2005, without first obtaining leave of this court. *Abdullah v. Gatto*, 773 F.2d 487, 488 (2d Cir.1985) (per curiam); *In re Martin–Trigona*, 737 F.2d 1254, 1262 (2d Cir.1984). These plaintiffs are permanently enjoined from proceeding further in this action, the Maine Action, and the Illinois Action, except to (a)

---

6. It is presently estimated that TEP has or soon will incur attorney's fees and costs of approximately $13,000 for the following matters: defending the Maine Action and the Illinois Action; responding to letters Smith has written to various vendors defaming TEP; and preparing for this motion.

7. Plaintiff Smith received a 2% license fee when his license with TEP was in force; thus he would have received only approximately $302.88 for these sales.

8. This court has inherent authority to sanction parties appearing before it for acting in bad faith, vexatiously, wantonly, or for oppressive reasons. *Sassower v. Field*, 973 F.2d 75, 80–81 (2d Cir. 1992) (citations omitted). I have found this to be the case with regard to these plaintiffs. However, given the circumstances, sanctions under Rule 11 may be more appropriate. *See* discussion *infra*.

seek appellate review of this action and this injunction determination, and (b) submit papers responding to applications regarding same, if any, by defendants.

■ Messrs. Smith and Kelley's status as *pro se* litigants does not insulate them from the imposition of sanctions by this court under Rule 11 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 11(b)-(c).[9] Such sanctions may be particularly appropriate when the offending party, although proceeding *pro se*, has demonstrated (and, in this case, affirmatively asserted) competence in finding and understanding the applicable law. *Baasch v. Reyer*, 827 F.Supp. 940, 944 (E.D.N.Y.1993); *Cornett v. Bank of New York*, 1992 WL 88197, *6 (S.D.N.Y.1992) (holding that plaintiff who "has shown an ability to find the law and to make legal arguments . . . may be held to a somewhat higher standard than other *pro se* parties"); *Durant v. Traditional Investments, Ltd.*, 135

F.R.D. 42 (S.D.N.Y.1991). Although not themselves attorneys, Messrs. Smith and Kelley have shown great energy and self-professed sophistication in the various areas of federal copyright law, corporate law, agency law, and contract law, as well as the differences in state law on these subjects. Both Smith and Kelley testified that they have each performed countless hours of legal research,[10] and they confidently articulated their legal claims and arguments at the hearing before me on November 18, 2005. Mr. Kelley even testified explicitly as to his awareness of and familiarity with Rule 11 sanctions and their potential applicability to him.[11] Hr'g Tr. 40. Under circumstances such as these, and on the court's own initiative pursuant to Fed.R.Civ.P. 11(c)(1)(B), I hereby direct Messrs. Smith and Kelley to show cause why they have not violated subdivision (b) of Rule 11,[12] given the following conduct.

9. It is well established that Rule 11 applies to *pro se* litigants. *See, e.g., Yosef v. Passamaquoddy Tribe*, 876 F.2d 283, 287 (2d Cir.1989), *cert. denied*, 494 U.S. 1028, 110 S.Ct. 1474, 108 L.Ed.2d 611 (1990); *Maduakolam v. Columbia University*, 866 F.2d 53, 56 (2d Cir.1989); *see also, Patterson v. Aiken*, 841 F.2d 386, 387 (11th Cir.1988) ("*pro se* filings do not serve as an 'impenetrable shield, for one acting *pro se* has no license to harass others, clog the judicial machinery with meritless litigation, and abuse already overloaded court dockets.' "). However, *pro se* parties are afforded greater leniency in considering whether or not to impose Rule 11 sanctions: "[w]hen a party appears *pro se*, it must be factored into the [objective] reasonableness standard." *Posner v. Minnesota Mining & Mfg. Co., Inc.*, 713 F.Supp. 562, 565 (E.D.N.Y.1989) (citations omitted). *See also, Haines v. Kerner*, 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (holding allegations of the *pro se* complaint to less stringent standards than formal pleadings drafted by lawyers); *Maduakolam v. Columbia University*, 866 F.2d 53, 56 (2d Cir. 1989) (in applying Rule 11, the court may consider the special circumstances of *pro se* litigants who are untutored in the law).

10. Mr. Kelley told this court that, in connection with the Maine Action alone, he spent "hundreds of hours" researching the law; and that, with respect to all of the actions, he read all of the briefs, motions, and cases cited. Hr'g Tr. 39–40, 69. Mr. Smith also testified that, although he could not estimate the precise number of hours, he did "[q]uite a bit" of legal research in connection with these filings, such that "[i]t's—been pretty much a full-time job." Hr'g Tr. 118. He

described: "I researched the parties and the laws that might be applicable. I joined Westlaw, got a [sub]scription to Westlaw. Set up a Pacer account. And tried to start learning the process of electronic filing." *Id.* At the November hearing, Mr. Smith exp⊘unded his own interpretation of my Order of February 2, 2005, stating that he "understood it that you were limiting not to [a] copyright decision, but a contractual decision." Hr'g Tr. 104–106. Furthermore, he told this court, in response to the question of whether or not he sought any professional opinion as to his copyright claims, that: "I [Smith] consider myself an expert. I'm an artist, teacher, professor. Have taken great expense and time to study as much as I can of copyright." Hr'g Tr. 107.

11. There was no need before considering the possibility of Rule 11 sanctions in this case to issue a prior warning. *See, e.g., Commer v. American Federation of State, County & Municipal Employees*, 272 F.Supp.2d 332, 340 (S.D.N.Y. 2003) (declining to impose sanction on a *pro se* plaintiff for conduct about which plaintiff had not been explicitly warned).

12. Which, for applicability here, states that appropriate sanctions may be imposed upon even an unrepresented party when a pleading, motion or paper signed by that party is presented to the court for an improper purpose, or when legal contentions therein are not warranted by existing law, or when allegations and factual contentions lack evidentiary support. Fed.R.Civ.P. 11(b)-(c); *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, 498 U.S. 533, 541–46, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991).

First, given the undeniably repetitive nature of the successive lawsuits filed, common sense suggesting that, having lost once—on the "willful" issue—before a jury, asserting essentially the same facts and claims against anyone affiliated with TEP, causing needless expense to other parties and placing an unnecessary burden on the courts, warrants the conclusion that these actions are driven by a desire to harass the defendants. *See* discussion *supra;* Fed.R.Civ.P. 11(b)(1).

Secondly, it became abundantly clear during the testimony of Messrs. Smith and Kelley at the hearing before me that neither of them possessed *any* information or knowledge whatsoever that could reasonably justify the expense and distress to numerous parties named, both individual and corporate, as defendants in the Maine and Illinois Actions. Indeed, as was revealed at the hearing, prior to naming Bruce Smith as an individual defendant in the Amended Complaint in the Maine Action, the only thing Smith and Kelley knew about Bruce Smith was the office he held at Berlin Industries. *See* Hr'g Tr. 47–49, 111–12. Thus, the allegations and factual contentions made against Bruce Smith lack the necessary evidentiary support, as a reasonable inquiry *ex ante* would have revealed.[13] Fed.R.Civ.P. 11(b)(3); *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 253 (2d Cir.1985) (Rule 11 "explicitly and unambiguously imposes an affirmative duty on each [party who signs a 'pleading, written motion, or other paper'] to conduct a reasonable inquiry into the viability of a pleading before it is signed. Simply put, subjective good faith no longer provides the safe harbor it once did."). It also remains unclear to me what evidentiary support or reasonable belief, if any, led Messrs. Smith and Kelley to name Patrick Chu and John Sgombeck in the Maine Action, and the Deroins in the Illinois Action, other than the mere fact that they happen to be principals of various companies to which plaintiff Smith sent a process server.

Accordingly, Mr. Kelley and Mr. Smith are ordered to show cause before me on January 20, 2006 at 2:30 p.m. in Courtroom 1106, why they have not violated subdivision (b) of Rule 11 with respect thereto as to their various signed pleadings, and appropriate relief if so justified.

So Ordered.

---

**13.** It is little consolation to note, as Mr. Kelley did, that the action against Bruce Smith will be dropped, now that Berlin Industries has contacted Richard Smith to inform him that, in fact, Bruce Smith has nothing to do with the daily management of the company. Hr'g Tr. 48–49.