■ MARTIN SCHLANGER et al., Respondents-Appellants, v BERNARD FLATON, Appellant-Respondent. [631 NYS2d 293] —Order, Supreme Court, New York County (William Davis, J.), entered August 24, 1994, which denied the parties' respective motions for summary judgment and severed and held in abeyance the issue of civil contempt pending a hearing and report by a Special Referee, unanimously modified, on the law, to the extent of granting plaintiffs' motion for summary judgment setting aside and cancelling defendant's stock and shareholder interest in the four subject corporations, removing him as an officer and director thereof and permanently enjoining him from taking any action in connection therewith, and otherwise affirmed, with costs to plaintiffs.

Plaintiff Martin Schlanger, along with his brother, nonparty Harold Schlanger, has been engaged in the selling and trading of foreign vehicles for his entire working life. While Harold has been in charge of the operation in Bronx County, Martin runs the business in New York County, which sells and services cars under the brand names of BMW, Buick, Fiat, Honda, Mazda and Volvo. The other plaintiff, Mark Schlanger, is Martin's son and a participant in the business. Although Martin has transferred or sold a 20% interest in the subject corporations to Mark, who is, therefore, a necessary party to this action, the latter was not involved in any of the events that underlie the dispute between Martin and defendant.

In 1970, Schlanger retained a close personal friend, defen-

dant Bernard Flaton, to be the attorney for both himself and the business, and, for the next 20 years, he rarely made an important decision without consulting Flaton. Thus, after 1970, most, if not all, legal matters pertaining to Martin Motor Sales, Inc., the New York County portion of the business, as well as many of a nonlegal nature, were handled by Flaton. While Schlanger did occasionally employ the services of other lawyers having a special expertise in, for instance, tax, labor relations, franchising and antitrust, he maintains that these individuals were recommended to him by Flaton.

In any event, Martin Motor Sales had two showrooms by 1982, one on the West Side of Manhattan at 700 Eleventh Avenue and the other on the East Side at 1274 Second Avenue, both of which were situated in leased properties. When the owners of these properties expressed their intention to eventually dispose of their real estate holdings to minimize the tax impact upon their estates after they died, Schlanger entered into negotiations to ultimately purchase the West Side property. The owners, accordingly, offered Martin Motor Sales a long-term lease at a fixed annual net rental of $150,000 until an option to buy the building became exercisable. Schlanger discussed the proposal with Flaton, who suggested that he agree to the arrangement. Flaton then took charge of the deal, arranged all the details, and the transaction closed on March 23, 1983.

Then, in March of 1983, the same owners announced an interest in selling their property at 627 Eleventh Avenue, involving some 17,500 square feet of commercial space, and offered another lease/option deal. Once again, Flaton was consulted, and he recommended that Martin Motor Sales also procure this parcel. The agreement was executed on March 23, 1983, following which Schlanger received a similar proposal for a 50,000-square foot, four-story building at 677 Eleventh Avenue whose roof Martin Motor Sales occupied for parking and storage. Schlanger after speaking with Flaton about the possibility of obtaining the lease and option, buying out the main tenant's lease, which was not due to expire until July 31, 1989, and renovating the space for exclusive use as a separate Honda showroom and service facility, accepted the deal.

However, it was during the discussions concerning the building at 677 Eleventh Avenue that Flaton, Schlanger contends, asserted a strong desire to participate in the acquisition of this property, claiming that he had always wanted to invest in real estate. The price quoted by the owners of the 677 Eleventh Avenue property for the option to purchase was $315,000, and

Flaton stated that he would pay one-half of that amount for a 50% share of each of the two corporations that would, respectively, hold the lease at a net annual rental of $98,500 and own the option to buy the building for $985,000 upon the death of the last surviving owner. Schlanger, apparently reluctant to disappoint Flaton or damage his long-standing friendship with him, agreed. It is uncontested that Flaton did not, prior to the closing on the property, which took place on August 2, 1983, advise Schlanger to consult independent counsel regarding any conceivable conflict of interest, or raise the possibility of a shareholders' agreement providing for the payment of rent, deadlocked voting, disputes among the stockholders and general management. Schlanger and/or Martin Motor Sales eventually expended approximately $2 million to buy out the existing leases and alter the premises so as to accommodate the automobile business.

Following the closing on the property at 677 Eleventh Avenue, Schlanger was contacted by the same owners with respect to another nearby 5,000-square-foot building at 625 West 51st Street, containing an adjoining 7,500-square foot vacant lot. Flaton again purportedly urged that he be permitted to take part in the proffered lease/option arrangement. The price for the option was $150,000, the net annual lease at $40,000 for the first five years and at $50,000 thereafter, and the option could be exercised upon the death of the last surviving owner at a cost of $500,000. Notwithstanding that Schlanger again acceded to defendant's desire to participate in the deal, there were, once more, no conversations as to the consequences that might result from Flaton becoming a 50% shareholder or the management of the property, and the latter did not suggest that Schlanger consult independent counsel. Furthermore, since Flaton did not even have the capital to pay for his half share of the option, Schlanger agreed to contribute the entire amount in exchange for credits on future legal services by Flaton to himself and Martin Motor Sales. The closing on 625 West 51st Street occurred on February 14, 1984.

Flaton was the attorney in connection with the contracts for both properties in which he acquired a share. Thus, he prepared all of the documents and made most of the business, tax and legal decisions relating to these deals despite the fact that he had a personal interest therein. Schlanger subsequently learned that while Flaton was acting as counsel to himself, Martin Motor Sales and, later, his son Mark, he was engaged in protecting his own interests at the expense of the Schlangers and the automobile business, insulating himself from having to

make any additional payments whatever, whether for taxes, rent or otherwise, while making the Schlangers solely responsible for certain liabilities and expenses.

In early 1987, Schlanger consulted an independent lawyer, Fred Plotkin, regarding a draft proposal between himself and Flaton for the operation of an Acura automobile dealership on one of the properties. While no such dealership ever materialized, Plotkin did, at that time, inform Schlanger of the "improprieties" entailed in failing to draw up a stockholders' agreement to cover any conflicts that might arise between him and Flaton. Nonetheless, Schlanger, his faith in Flaton still intact, did not seek advice from another lawyer, and Plotkin's services were terminated. In the meantime, Flaton continued to act as Schlanger's counsel, and, in 1987, after Schlanger had spent money to improve certain space at 677 Eleventh Avenue, Flaton moved his law offices there. Schlanger states that he not only paid the costs of the renovations but that Flaton occupied the space rent free and did not pay for any utility, repair and maintenance costs.

Over the course of time, Schlanger and Flaton began to disagree over the management and operation of the properties, Flaton demanding that Martin Motor Sales pay "market" rent for the premises that it occupied. Additionally, he allegedly threatened to dissolve the corporations and, as half owner, exercise all of his rights under the laws of the State of New York. Finally, in July of 1990, Flaton informed Schlanger that he was terminating the attorney-client relationship, recommending to the latter that he procure new counsel for himself and Mark. In August of 1990, Flaton's attorney wrote to the Schlangers demanding the payment of rent that was purportedly owing. Flaton then sent out a notice for a shareholders' meeting, the first time that this had apparently been done, for the purpose of taking steps to collect rents from Martin Motor Sales. After Schlanger obtained new counsel, the instant action for rescission of Flaton's interest in the corporations, as well as to enjoin him from acting as an officer or director thereof, ensued. Specifically, the complaint accuses Flaton of having violated his professional and fiduciary obligations in contravention of Code of Professional Responsibility DR 5-104 (A) (22 NYCRR 1200.23 [a])

Extensive discovery has already taken place. In February of 1994, defendant moved, in relevant part, for summary judgment dismissing the complaint, arguing that, although he did not violate any duty to disclose, the complaint is, nevertheless, barred by the applicable Statute of Limitations and that

plaintiffs are also precluded from advancing any claims against him because of laches and/or ratification. Plaintiffs opposed the motion and cross-moved for summary judgment in their favor. The IAS Court denied the respective motions for summary judgment, finding that there are unresolved questions of fact precluding such relief to either party, and both sides have appealed.

DR 5-104 (A) states, in part, that "[a] lawyer shall not enter into a business transaction with a client if they have differing interests therein * * * unless the client has consented after full disclosure." Apart from the dubious propriety of Flaton's availing himself of the lease/option offers that had been extended to Schlanger by turning them into investment opportunities for his own benefit, while, at the same time, he was providing legal representation to Schlanger in almost all aspects of the latter's business and personal life, it is undisputed that Flaton made no disclosure of the legal implications of his assuming a half share in the subject corporations. He also never advised Schlanger to procure independent legal counsel. Moreover, Flaton prepared all of the necessary documents to consummate the transactions, acting as the attorney for himself, Schlanger and the corporations, and arranged all of the details to his own advantage.

Although an attorney is not prohibited from entering into a contract with a client, such an agreement "is not advisable" (*Greene v Greene*, 56 NY2d 86, 92), and, here, it is clear that Flaton breached both DR 5-104 (A) and his fiduciary obligations. The present matter is not one of a lawyer simply undertaking a business relationship with a client, but rather of a lawyer, in effect, exploiting his own client through a lack of disclosure and also pursuing affirmative steps to benefit himself at the expense of that client. Yet, as the Court of Appeals explained in *Matter of Cooperman* (83 NY2d 465, 472): "This unique fiduciary reliance, stemming from people hiring attorneys to exercise professional judgment on a client's behalf— 'giving counsel'— is imbued with ultimate trust and confidence * * * The attorney's obligations, therefore, transcend those prevailing in the commercial market place * * * The duty to deal fairly, honestly and with undivided loyalty superimposes onto the attorney-client relationship a set of special and unique duties, including maintaining confidentiality, avoiding conflicts of interest, operating competently, safeguarding client property and honoring the clients' interests over the lawyer's."

The law requires that an agreement between an attorney and client be construed most favorably for the client (*Shaw v*

*Manufacturers Hanover Trust Co.*, 68 NY2d 172, 177). Since the relationship between a lawyer and his client is a fiduciary one, the attorney may not take advantage of his superior knowledge and position. Even in the absence of any indication of fraud or undue influence on the part of the attorney, the agreement may still be invalid "unless he can show that the client was fully aware of the consequences and that there was no exploitation of the client's confidence in the attorney" (*Greene v Greene, supra*, at 92). Allegations by the client, as here, that he did not understand the terms or the effect of the agreement are sufficient, if proven, to entitle him to rescission unless the attorney "can convincingly show that [the client] was fully and fairly informed of the consequences of the agreement and the special advantages it gave to [him]" (*supra*, at 93).

Flaton admits that he did not advise Schlanger to consult with independent counsel, and, moreover, he does not deny that he never discussed, nor reached any agreement, with Schlanger concerning the use and occupancy of the premises by Martin Motor Sales, the payment of rent, the apportionment of costs, the alteration or improvement of the properties, dispute resolution, deadlock voting and so forth. Therefore, Flaton could not conceivably meet the requisite burden and establish that Schlanger knowingly permitted him to join in on the lease/option arrangement on a 50/50 basis. Indeed, even the manner in which Flaton acquired his 50% interest in the second property is improper. By his own admission, he procured the necessary funds for the second lease/option deal in which he participated by having Schlanger advance him his share of the costs through a credit for future legal services, a form of borrowing funds from a client. Recently, the Third Department censured two attorneys who accepted a loan from their client, a long-time family friend (*Matter of Coxeter*, 208 AD2d 1178).

Flaton attempts to excuse his conduct by claiming that he made such disclosure as was appropriate to a sophisticated businessman in Schlanger's position. Yet, in *Forest Park Assocs. Ltd. Partnership v Kraus* (175 AD2d 60, 62), this Court rejected this sort of reasoning when it observed that "the Code of Professional Responsibility places the burden upon counsel, irrespective of the sophistication of the client, to obtain his consent after full disclosure before entering into a business transaction, such as the one in issue, where the differing interests of counsel and the client may interfere with the exercise of professional judgment for the client's protection".

Certainly, the divergence in interests between Flaton and Schlanger is demonstrated, if by nothing else, by the fact that the parties are now embroiled in this litigation. Flaton having entered into a business agreement with Schlanger in the absence of proper disclosure, has clearly acted contrary to his fiduciary obligations and in violation of DR 5-104 (A).

Flaton advances the Statute of Limitations, as well as the doctrines of laches and ratification, in an effort to avoid rescission. However, the six year Statute of Limitations applicable to Schlanger's demand for rescission was tolled until the attorney-client relationship between himself and Flaton had been terminated with respect to the matter underlying the dispute between them (*Glamm v Allen*, 57 NY2d 87; *Greene v Greene, supra*). The "continuous representation" standard "recognizes that a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith, and realistically cannot be expected to question and assess the techniques employed or the manner in which the services are rendered" (*Greene v Greene, supra*, at 94). The attorney-client relationship between the parties ended in July of 1990, and only then did the Statute of Limitations begin to run. The summons and complaint were thus timely served in September of 1990.

Regardless of the nature of Schlanger's consultation with Plotkin in 1987, it does not render the claim for rescission untimely. The record demonstrates that Flaton continued until 1990 to provide Schlanger with legal services for Martin Motor Sales on an almost daily basis, including for the corporations in which he had an interest. Further, as the IAS Court aptly concluded, it is impossible to separate the services that Flaton performed in connection with the subject corporations from those rendered to the automobile business generally. Consequently, the continuing nature of Flaton's legal work is clearly established by the record.

As for Flaton's claims of laches and ratification, these arguments are entirely lacking in substance. Flaton was Schlanger's attorney and advisor until July of 1990, and the action was commenced only months later. Yet, even assuming that Schlanger knew, or should have known, from the date of his conversation in 1987 with Plotkin that Flaton had behaved improperly, a three-year delay is hardly so excessive as to warrant the imposition of laches and/or ratification.

We have considered Flaton's remaining arguments and find them to be without merit. Concur—Sullivan, J. P., Rubin, Ross, Nardelli and Mazzarelli, JJ.