OPINION OF THE COURT
Mazzarelli, J.P.
Fifth-party defendant Simon Leo Verhoeven and defendant Osvaldo Patrizzi were principals in a group of entities (the Anti-quorum entities) that primarily engaged in the business of selling and trading antique time pieces. The Antiquorum entities were plaintiff Antiquorum, S.A., a Swiss corporation (ASA), plaintiff Antiquorum USA, Inc., a Delaware corporation (AUSA), nonparty C2C Time, Inc. and nonparty Antiquorum Auctioneers (Hong Kong) Ltd. In or about 2005, Verhoeven (whose stake in the Antiquorum entities was held through defendant Habsburg Holdings Ltd. [Habsburg], a separate entity), and Patrizzi, decided to sell their interests in the Antiquorum entities. Plaintiff Evan Zimmermann introduced them to a Japanese company that agreed to purchase all of the assets of the Anti-quorum entities. Zimmermann is an attorney who Patrizzi asserts was his friend as well as his personal attorney. He further claims that Zimmermann was a legal advisor to the Antiquorum entities for several years prior to the subject transaction, representing the entities in contract and litigation matters and filing trademark applications. Zimmermann contends that his role in bringing the buyer to the attention of Verhoeven and Patrizzi was strictly as a broker. Verhoeven and Patrizzi, on the other hand, contend that Zimmermann at all times acted as their legal counsel. While there is some question over what Zimmermann’s role was, there is no real dispute that defendant/ interpleader-plaintiff/fourth-party defendant/fifth-party plaintiff Michael Levine, also an attorney, provided counsel to Habsburg and Patrizzi in structuring the deal and advising them how to proceed.
Levine prepared a share purchase agreement (SPA) which identified Habsburg and Patrizzi as the “Stockholders” in the Antiquorum entities. The SPA contemplated a sale of 100% of the stock of the Antiquorum entities. However, the parties later amended the agreement to reflect the sale of only half the shares in the Antiquorum entities and to change the identity of the buyer from Yokohama Information Technology Company *250 Limited to Artist House Holdings, Inc. (AH). The amended agreement provided that “[o]n the Closing Date, the Stockholders shall deliver all stock certificates in their possession evidencing such stock ownership ... to the Escrow Agent.” Upon the transfer of the shares, AH was to “deliver to the Stockholders,” by way of payment to the escrow agent, the deal’s $30 million cash purchase component. The agreement further provided that “the Escrow Agent shall only release funds to such shareholders of the [various Antiquorum entities] as deliver its or his shares to the Escrow Agent.” Levine was designated by the agreement as the escrow agent.
The SPA included a schedule setting forth the amount of stock held by each shareholder in the various entities. The schedule provided that Habsburg owned all 2,100 shares of ASA, and that, of the 49 shares making up AUSA, ASA held 25 and Patrizzi held 24. It further stated that C2C Time, Inc. was comprised of 100 shares, 35 of which were owned by Patrizzi, 35 by AUSA and 30 by ASA. Finally, the SPA represented that the fourth entity being sold, Antiquorum Auctioneers (Hong Kong) Ltd., was wholly owned by ASA.
Patrizzi and Zimmermann entered into a separate agreement which is at issue. That agreement, known as the Stock/Sales Proceeds Distribution Agreement (SPDA), was related to an arrangement which Patrizzi had entered into with Yokohama (and to which AH succeeded) pursuant to which, in exchange for consulting with the buyer after the SPA was performed, Patrizzi would become an owner of 50% of whichever entity acquired the Antiquorum entities. The SPDA further reflected the fact that inventory belonging to the Antiquorum entities was not subject to the SPA. Pursuant to the SPDA, Patrizzi agreed that the new shares earned by him for consulting would be transferred by him to a new entity that he would own equally with Zimmermann. Patrizzi also agreed to evenly share the proceeds from any inventory sales with Zimmermann. The SPDA was drafted by Levine. It contained an express statement that Levine would be paid part of Zimmermann’s share if the SPA went forward. Recognizing his role in advising Patrizzi with respect to the SPA and the SPDA, Levine included the following provision in the agreement:
“It is hereby understood and agreed by the parties that Michael L. Levine, Esq. has drafted this Agreement, without compensation, as an accommodation to the parties and without representing either party *251 in the negotiation or execution of this Agreement. The parties acknowledge that Michael Levine, Esq. has acted as counsel for both Zimmermann and Patrizzi in the past, and has a personal economic interest in a portion of the distribution of the Patrizzi Funds to Zimmermann. Patrizzi and Zimmermann each acknowledge that they have been advised by Michael L. Levine, Esq. that a conflict of interest exists, have fully considered the same, and have elected to have Michael L. Levine, Esq. draft this Agreement notwithstanding the same. Patrizzi and Zimmermann further specifically acknowledge and represent that neither of them have received any legal advice from, nor are relying upon any information provided by, Michael Levine, Esq., and have each consulted with (and been represented by) independent counsel.”
The purchase by AH of the Antiquorum shares closed on or about January 16, 2006. Although AH tendered the full purchase price, Habsburg only tendered 1,268 of its shares in ASA, the remaining shares having been frozen by Swiss authorities in connection with a criminal investigation of Habsburg and Verhoeven. Shortly thereafter, Levine, as escrow agent, received written instructions from Habsburg and Patrizzi about how to disburse the sale proceeds, and did so without objection from AH or any other party. The instructions included a directive that Levine retain a sum of money in escrow pending resolution of the legal questions surrounding the ASA shares that could not be tendered.
This action was commenced against Habsburg and Patrizzi and Levine, in his capacity as escrow agent, by AQ Asset Management LLC, (AQ) as assignee of AH, and by ASA, AUSA and Zimmermann. AH and Zimmermann had gained control over ASA and AUSA from Habsburg and Patrizzi at an ASA general shareholders meeting held in 2007, after the closing. Although AH held only 50% of the shares of ASA, it and Zimmermann relied on the SPDA’s purported grant to Zimmermann of the right to vote half of the other 50% of the shares in that entity. Using this power, AH and its affiliates ousted all prior board members of ASA, including Verhoeven, and stripped Patrizzi of his role in ASA. They elected a new board, which included Zimmermann. In the complaint, ASA and AUSA alleged that Habsburg and Patrizzi wrongfully claimed to control the shares in those entities when entering into the SPA, and *252 that any payment for the sale of those shares should have been made to ASA and AUSA, not to Habsburg and Patrizzi.
AQ claimed in the complaint that Habsburg failed to tender all of the shares in the Antiquorum entities required by the SPA and sought reimbursement from Habsburg for the value of those shares. Zimmermann asserted a claim against Habsburg related to those shares in ASA that he expected to receive in connection with the SPDA. Finally, ASA, as an owner of AUSA, C2C Time, Inc. and Antiquorum Auctioneers (Hong Kong) Ltd., and AUSA, as an owner of C2C Time, Inc., sought to be paid for the value of its shares in those entities.
Levine answered the complaint, and asserted an interpleader counterclaim which named plaintiffs and defendants as inter-pleader defendants. Habsburg and Patrizzi then commenced a “fourth-party action” against Levine, claiming generally that he acted in bad faith in ignoring their instructions to pay them what they contended they were owed out of escrow. Patrizzi further claimed that, after ASA deposited $2 million into escrow, representing what Patrizzi stated were the proceeds of a sale of inventory, Levine paid the money back to ASA or paid it to Zimmermann, honoring Zimmermann’s representation, disputed by Patrizzi, that the $2 million belonged to him under the SPDA. Habsburg and Patrizzi also asserted claims against plaintiffs in which they sought damages and equitable relief related to the various transactions. Specifically as against Zimmermann, Habsburg and Patrizzi asserted that he breached a duty of loyalty to them by negotiating for himself, and Levine, shares in the new entity that acquired the Antiquorum entities, as well as a share in the inventory proceeds, and that he did so by interpreting agreements in a manner that benefited only himself, and that took advantage of Patrizzi’s limited knowledge of English.
Finally, Levine commenced a fifth-party action against Patrizzi and Verhoeven and two others. The pleading was based on the allegation that Patrizzi and Verhoeven committed fraud by having represented to Levine, after the January 2006 closing, that Patrizzi owned, and was entitled to payment for, 273 shares in ASA. Levine asserted that Patrizzi had divested himself of any shares in ASA five years earlier.
This appeal brings up for review four separate orders arising out of four separate motions. The first motion was brought by Habsburg and Patrizzi by order to show cause in which they sought partial summary judgment directing Levine to disburse *253 to them from escrow all amounts due and owing to them under the SPA. The motion further sought a declaration in Patrizzi’s favor that the SPDA was null and void. In addition, the motion asked for a preliminary injunction requiring Zimmermann and/or ASA and/or Levine to pay into court the $2 million allegedly representing inventory proceeds; compelling Levine and Zimmermann to turn over to Habsburg and Patrizzi all files relating to the escrow account and their representation of Habsburg, Patrizzi, ASA and AH; preventing ASA and AQ from disposing, transferring or encumbering any of the ASA inventory; and directing Zimmermann to pay into court the sum of approximately $3.2 million that Habsburg and Patrizzi allege was wrongfully paid to him by AH shortly after the closing.
In arguing that Levine was wrong to give credence to any claim on the escrowed monies other than their own, Habsburg and Patrizzi noted that the only parties to the agreement who were entitled to be paid the sales proceeds were themselves, as the “Stockholders” in the entities being sold. They asserted that no other person or entity delivered stock into escrow, so no other person or entity is entitled to payment for the shares that were tendered. In opposition, plaintiffs and Levine asserted that many of the shares which Habsburg and Patrizzi placed in escrow were not actually owned by them. The shares in question were either ASA shares, or shares of the other entities which were owned by ASA. Plaintiffs and Levine described a series of transactions between Habsburg and Patrizzi, and ultimately ASA, with regard to a minority share of ASA stock. Initially, they contended, Habsburg owned 80% of ASA and Patrizzi owned the remaining 20%. However, through a series of purchases and other transactions, Habsburg ended up with 87% of the shares, Patrizzi with 0%, and ASA with 13% of the company in treasury shares. Thus, they contend, neither Habsburg or Patrizzi ever had the right to “sell” those treasury shares. According to plaintiffs and Levine, ASA was entitled to payment for those 13% of the total shares, not Habsburg and not Patrizzi. Plaintiffs and Levine further argued that Habsburg lost its right to sell any of the ASA shares owned by it when it transferred them to Levine, because it lost those shares as the result of a capital call which took place in January 2008, after the closing of the sale to AH.
Zimmermann submitted an affidavit denying that he ever served as counsel to Habsburg or Patrizzi in connection with the sale to AH and stating that he acted strictly as a broker. He *254 further asserted that the $2 million that had been placed in escrow, and which Habsburg and Patrizzi claim represented inventory proceeds, was transferred to Levine in error and had nothing to do with inventory. He disclaimed any entitlement to that money. Zimmermann further stated that Habsburg and Patrizzi’s request for an injunction against alienation of inventory was moot, since no more inventory existed. Indeed, Zimmermann suggested that Habsburg and Patrizzi sold all of the inventory while they were still in control of the Antiquorum entities. Finally, Zimmermann represented that any monies which he received from AH after the closing were in no way paid to him improperly, since they merely compensated him for his success in his capacity as a broker.
Levine also submitted an affidavit in opposition to the motion. He reiterated that Zimmermann had nothing to do with the drafting of the SPDA, and he further disputed the facts underlying Patrizzi’s position that he was duped into signing that document and that the true economic impact of the document was concealed from him. Levine further asserted that Patrizzi was fully aware that Zimmermann was exercising his purported rights to vote shares in ASA and did not voice any objection. Finally, Levine stated that, notwithstanding any real or perceived conflict of interest on his or Zimmerman’s part in connection with the sale of Habsburg’s and Patrizzi’s interests in the Antiquorum entities, no real harm inured to Habsburg and Patrizzi because they were represented by independent counsel. In reply, Patrizzi acknowledged that he had negotiated to sell his shares in ASA, but stated that the transactions were never consummated.
The second motion at issue was brought by Levine in connection with the fourth-party action commenced against him by Habsburg and Patrizzi. Levine sought an order requiring Habsburg and Patrizzi to post a bond securing his costs pursuant to CPLR 8501 (b). He argued that security was necessary because Habsburg and Patrizzi both resided in foreign jurisdictions. Further, pursuant to CPLR 8503, he sought security in excess of the mandatory $500, in the amount of $75,000. He argued that this amount was appropriate because Habsburg and Patrizzi had engaged in frivolous litigation against him, for which he would be entitled to fees under the Rules of the Chief Administrator of the Courts (22 NYCRR) § 130.1-1. He further relied on the attorneys’ fees provision in the SPA.
The final two motions arose out of Habsburg’s and Patrizzi’s service of nonparty subpoenas on two banks, TD Bank and *255 Karastir LLC. The TD Bank subpoena sought records of transactions in Zimmermann’s escrow account, to identify payments made and/or received by Zimmermann in connection with the transaction. The subpoena to Karastir sought records regarding an allegedly improper transfer to Karastir of some $900,000 from the monies held by Levine. AQ and Zimmermann moved to quash the TD Bank subpoena. Levine moved to quash the Karastir subpoena. They moved on the grounds that the subpoenas were premature, discovery was stayed and the subpoenas were overbroad. Habsburg and Patrizzi argued in opposition that they had a right to take nonparty discovery and that movants lacked standing to quash subpoenas directed to nonparties seeking documents of nonparties.
Supreme Court denied the motion for partial summary judgment. The court found that issues of fact precluded summary judgment on the claim for the remaining purchase price. With regard to the SPDA, the court found that issues of fact existed regarding Zimmermann’s role in the transaction and whether Patrizzi consulted with independent counsel in a manner that relieved Zimmermann of any duty of impartiality towards Patrizzi. The court ordered the provision of various books and records to Habsburg and Patrizzi, but otherwise denied them any preliminary injunctive relief.
In a separate order, the court granted Levine’s motion pursuant to CPLR 8501 and 8503 and required Habsburg and Patrizzi to either pay into court, or file a surety bond in the amount of, $75,000, to secure costs and fees Levine claimed he would be awarded in connection with the fourth-party claims. Finally, in two separate orders, the court quashed the subpoenas on TD Bank and Karastir.
In arguing that they are entitled to the money still in Levine’s escrow, Habsburg and Patrizzi focus on the plain language of the SPA. The SPA, they point out, identifies them as the only “Stockholders,” and provides quite simply that the “Stockholders” are to transfer 50% of the stock in the Antiquorum entities to AH, and that in exchange AH is to pay $30 million cash to the Stockholders. AQ, ASA and AUSA argue in opposition that this interpretation ignores other language in the SPA, specifically section 13.4.2.B which provides, in relevant part:
“Escrow Agent shall next pay any remaining funds in such manner as is reflected on the written Disbursement Instruction executed by each Stock *256 holder and delivered to Escrow Agent; provided, however, that the Escrow Agent shall only release funds to such shareholders of the Company as deliver its or his shares to the Escrow Agent or the Transfer Agent when the same are actually delivered in accordance with the provisions of this Stock Purchase Agreement.”
AQ, ASA and AUSA contend that this language indicates that only the actual shareholders in the entities that were sold are entitled to payment. Because they claim that there is a question whether Habsburg and Patrizzi actually owned any shares in ASA at the time of the sale, they assert that Habsburg and Patrizzi should not have been awarded summary judgment.
1 ‘It is well settled that our role in interpreting a contract is to ascertain the intention of the parties at the time they entered into the contract” (Evans v Famous Music Corp., 1 NY3d 452, 458 [2004]). Further, in interpreting any agreement, it is “important to read the document as a whole to ensure that excessive emphasis is not placed upon particular words or phrases” (South Rd. Assoc., LLC v International Bus. Machs. Corp., 4 NY3d 272, 277 [2005]). The parties to the SPA were Habsburg and Patrizzi, as sellers, and AH, as buyer. Notably, none of the Antiquorum entities themselves were parties. The SPA reflects that it was the intention of the parties that Habsburg and Patrizzi, as the “Stockholders” of the Antiquorum entities, would effectuate the transfer to AH of 50% of the shares constituting those entities, and that AH would pay them consideration. The SPA was unconcerned with who technically owned the entities. Rather, it recognized that Habsburg and Patrizzi controlled the entities and that the instrument had the sole purpose of compensating them for relinquishing shares in the entities to AH.
Plaintiffs and Levine question whether Habsburg and Patrizzi had the right to transfer shares in ASA in the first place, because of the machinations they claim resulted in each of them losing any ownership interest in that entity. However, this ignores the overarching goal of the transaction and places too great an emphasis on the provision that “the Escrow Agent shall only release funds to such shareholders of the [Antiquorum entities].” In emphasizing that the “Stockholders” of the entities were Habsburg and Patrizzi, the SPA indicated that the legal niceties of who owned the shares in the entities was secondary to the fact that Habsburg and Patrizzi controlled the shares at the time of the transaction.
*257 Further, there can be no question that AH received the benefit of its bargain. After all, in stripping Habsburg of any remaining interest in ASA, which Levine cites as the basis for depriving Habsburg of any of the remaining monies in escrow, AH voted the shares that it received under the SPA. Further, Levine’s emphasis on Habsburg’s failure to answer a capital call in 2008, which he contends divested it of any interest in ASA, is irrelevant. That is because the SPA plainly states that, upon tender of the 50% of shares “all obligations of the Stockholders shall be deemed discharged in full.” At bottom, Levine, AQ, ASA and AUSA seek to enforce their own interpretation of an agreement to which they were not parties (except for Levine in his limited role as escrow agent), which was fully consummated, and which was carried out as intended. To permit the unraveling of the transaction would be to ignore the plain language of the SPA and also the notion that parties are free to contract as they wish and that courts should enforce those contracts as written (see Oppenheimer & Co. v Oppenheim, Appel, Dixon & Co., 86 NY2d 685, 695 [1995]). Accordingly, we grant partial summary judgment to Habsburg and Patrizzi on their claim related to the remaining cash proceeds.
Turning to the SPDA, Patrizzi asserts that he should have been granted partial summary judgment invalidating it because it violated Code of Professional Responsibility DR 5-104 (22 NYCRR 1200.23), the relevant rule at the time, which limited an attorney’s ability to enter into a business transaction with his or her client. He also argues that the SPDA is not supported by consideration. Zimmermann counters that DR 5-104 is irrelevant, because he was not Patrizzi’s lawyer with regard to the sale of the Antiquorum entities.
Indeed, nowhere does the SPA refer to Zimmermann as Patrizzi’s counsel or otherwise indicate that he was. Further, the correspondence between Zimmermann and Patrizzi concerning the transaction is inconclusive as to whether Zimmermann was advising Patrizzi or acting as his business partner. Likewise, it is impossible to conclude from this record that, as Patrizzi claims, Zimmermann had the special duty of an attorney based on his former representation of Patrizzi in unrelated matters. Matter of Ioannou (89 AD3d 245 [1st Dept 2011]), which Patrizzi cites, is inapposite. This Court stressed in that decision that whether DR-5-104 can be invoked based on an attorney’s former representation of a client “will necessarily be a highly fact-specific inquiry” (89 AD3d at 250). In that matter, we held that
*258 “the circumstances rendered it imperative for respondent to comply with DR 5-104 (a) in entering into a transaction with this particular former client, given, among other things, the former client’s relative lack of sophistication in business matters, the personal nature of the former professional relationship, the importance to the former client of the matter in which respondent represented him, and the fact that the former client had sought respondent’s advice on a matter related to the former representation only about two weeks before respondent proposed the transaction” (id.).
Here, there are insufficient facts upon which to definitively decide, one way or the other, whether Zimmermann had an ethical duty as a lawyer to Patrizzi.
Patrizzi’s argument that Zimmermann is not entitled to recover under the SPDA because his position in this litigation, if adopted, would render Patrizzi’s proceeds from the sale of the Antiquorum entities far less than he anticipated when Zimmermann brought the deal to his attention, is academic, because, as discussed above, we have rejected Zimmermann’s position. Further, there is no question that Zimmermann’s work in fashioning the transaction in a manner whereby Patrizzi would retain an interest in the Antiquorum entities, as well as the inventory, constituted adequate consideration for the SPDA.
We further find that Patrizzi was not entitled to summary judgment invalidating Levine’s claim to monies due him under the SPDA. This is primarily due to the disclaimer contained in that document, pursuant to which the parties acknowledged that Levine had represented both Patrizzi and Zimmermann in the past, and that Levine had an economic interest in their business relationship. The disclaimer satisfies DR 5-104, insofar as it puts forth the conflict in writing, advises the parties to seek independent counsel, and obtains a written waiver of the conflict. Schlanger v Flaton (218 AD2d 597 [1st Dept 1995], lv denied 87 NY2d 812 [1996]), upon which Patrizzi relies, is unavailing because there, in addition to other clear violations of DR 5-104, the lawyer engaged in a complicated purchase of a 50% interest in various businesses, and failed to explain to his client all of the legal implications of his obtaining that interest. Here, in contrast, there is no evidence that Levine failed to disclose to Patrizzi any material facts or other information which an attorney would reasonably have been expected to make known to his or her client.
*259 Habsburg and Patrizzi challenge the denial of the three types of injunctive relief they sought. The first element of relief, which pertains to the $2 million that they allege represented inventory proceeds but were paid out by Levine to AH and/or Zimmermann, is moot, because, after the instant appeal was perfected, the motion court dismissed all claims by Habsburg and Patrizzi related to those funds.
The second form of injunctive relief Habsburg and Patrizzi sought related to the proceeds of the sale of the inventory. AQ principally argues that there can be no irreparable harm from the mere loss of money. However, an exception to this rule exists where the monies at issue are identifiable proceeds that are supposed to be held for the party seeking injunctive relief (see Amity Loans v Sterling Natl. Bank & Trust Co. of N.Y., 177 AD2d 277, 279 [1st Dept 1991] [finding that restraint on funds held by financing company was appropriate where it was required to maintain the funds in trust for the party seeking the injunction]). Here, the funds at issue are clearly identifiable as the proceeds of the sale of the pre-acquisition inventory of the Antiquorum entities, which were given in escrow to Levine. Accordingly, they should be restrained pending the resolution of the dispute concerning the proceeds.
On the other hand, Habsburg and Patrizzi also sought to require Zimmermann to pay into court the monies which he claims he received from AH as a so-called “M&A fee.” However, because the claim does not involve any identifiable proceeds that were required to be held on their behalf, the claim does not fall within the exception noted in Amity Loans. Therefore, because Habsburg and Patrizzi have an adequate remedy at law and there is no threat of irreparable harm, injunctive relief on this point was properly denied.
We disagree with the motion court’s decision to require the posting by Habsburg and Patrizzi of security against potential costs of Levine in the amount of $75,000. Levine is correct in asserting that he may ultimately be awarded attorneys’ fees under the provision in the SPA holding him harmless, as escrow agent, against claims arising from his activities in that capacity, and under section 130.1-1 of the Rules of the Chief Administrator of the Courts (22 NYCRR). However, he has cited to no authority establishing that the costs contemplated by CPLR 8503 include attorneys’ fees. In the absence of such direct support we are reluctant to require the posting of security for such fees. Weber v Kessler (135 Misc 2d 618 [Sup Ct, *260 Dutchess County 1987]), upon which Levine relies, is not instructive, because CPLR 8303-a, which that case addressed, expressly authorizes an award of attorneys’ fees in certain tort actions, in addition to “costs.” However, we do find that Habsburg and Patrizzi should be required to post security for costs in the amount of $5,000.
Finally, we find that the court properly quashed the nonparty subpoenas served by Habsburg and Patrizzi. Habsburg and Patrizzi correctly argue that the movants lacked standing to bring motions to quash. As this Court noted in Matter of Shapiro v Chase Manhattan Bank, N. A. (53 AD2d 542 [1st Dept 1976]), a depositor has no ownership or other interest in a bank’s records of his accounts. Thus, he has no standing to object to a subpoena directed at them. While, as Zimmermann and Levine note, that case involved an investigative subpoena, the proposition remains true, even more strongly, in the civil context.
However, this does not end the inquiry. A court has power, without any motions by the parties, to control and order discovery. Here, the court ordered TD and Karastir to preserve all responsive documents, in the event the parties did not provide the documents and the subpoenas to the nonparties had to proceed. Therefore, the court did not abuse its discretion in directing that party discovery proceed first, and nonparty discovery afterwards.
Accordingly, the order of the Supreme Court, New York County (Shirley Werner Kornreich, J.), entered on or about August 3, 2012, which (1) denied the motion of Habsburg and Patrizzi for partial summary judgment (a) declaring their entitlement to payment from Levine, as escrow agent, the remaining cash proceeds of the sale of their shares in the Anti-quorum entities to AH, and (b) declaring invalid the Stock/Sales Proceeds Distribution Agreement; and (2) denied preliminary injunctive relief to Habsburg and Patrizzi (a) requiring Zimmermann and Antiquorum, S.A., or, alternatively, Levine, to pay into court $2 million previously disbursed by Levine from the escrow account; (b) enjoining AQ Asset Management LLC and Antiquorum, S.A. from disbursing any additional proceeds from the sale of certain inventory belonging to the entities; and (c) requiring Zimmermann to pay into court some $3.2 million paid to him by Artist House Holdings, Inc., should be modified, on the law, to grant Habsburg and Patrizzi partial summary judgment on their claim for payment of the remaining cash proceeds *261 and to grant a preliminary injunction enjoining AQ Asset Management LLC and Antiquorum, S.A. from further disbursing any proceeds from the sale of the inventory, and otherwise affirmed, with costs. The order of the same court and Justice, entered on or about August 2, 2012, which granted the motion of Levine to quash a nonparty subpoena directed to Karastir LLC, should be affirmed, with costs. The order of the same court and Justice entered on or about August 3, 2012, which granted the motion of AQ Asset Management LLC, Antiquorum, S.A., Antiquorum USA, Inc. and Zimmermann to quash a nonparty subpoena directed to TD Bank, should be affirmed, with costs. The order of the same court and Justice, entered August 17, 2012, which granted the motion of Levine pursuant to CPLR 8501 to require sellers to post $75,000 as security for costs, should be modified, on the law and the facts, to reduce the amount of security that must be posted to $5,000, and otherwise affirmed, with costs.
Andrias, DeGrasse, Freedman and Manzanet-Daniels, JJ., concur.
Order, Supreme Court, New York County, entered on or about August 3, 2012, modified, on the law, to grant Habsburg and Patrizzi partial summary judgment on their claim for payment of the remaining cash proceeds and to grant a preliminary injunction enjoining AQ Asset Management LLC and Antiquorum, S.A. from further disbursing any proceeds from the sale of the inventory, and otherwise affirmed, with costs. Order, same court and Justice, entered on or about August 2, 2012, affirmed, with costs. Order, same court and Justice, entered on or about August 3, 2012, affirmed, with costs. Order, same court and Justice, entered August 17, 2012, modified, on the law and the facts, to reduce the amount of security that must be posted to $5,000, and otherwise affirmed, with costs.